## UNITED STATES v. NIMERICK.

### No. 189.

Circuit Court of Appeals, Second Circuit.

March 24, 1941.

Writ of Certiorari Denied June 2, 1941.

See 61 S.Ct. 1117, 85 L.Ed. ——.

Lawrence & O'Brien and Harold I. O'Brien, all of Rutland, Vt., and Joseph E. Green and William C. Wines, both of Chicago, Ill., for defendant-appellant.

Joseph A. McNamara, U. S. Atty., and Bernard J. Leddy, Asst. U. S. Atty., both of Burlington, Vt., for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendant was indicted for a robbery of the Caledonia National Bank at Danville, Vermont, on the 4th of June, 1934, and also by separate indictment for conspiring with one Simons to rob that bank. The overt act in furtherance of the conspiracy set forth was the stealing of a Plymouth sedan car at Gardner, Mass. The two cases were consolidated for the purpose of the trial and likewise for the hearing of the appeal. The defendant interposed pleas in bar asserting the defense of the statute of limitations, and the government filed replications averring that the

defendant was a fugitive from justice. The issues raised by the pleas in bar and replications were heard, without any objection at the time on the part of the defendant, by the judge without a jury. The court thereupon found, upon ample evidence, that on the day of the robbery, or the next day, the defendant had fled from the State of Vermont and since then had been living outside of that state under assumed names and in various places, and, until his arrest in Chicago, on May 9, 1940, had been concealing himself and had been a fugitive from justice. Upon the overruling of the pleas in bar the trial proceeded before the jury.

The testimony indicated that the bank was robbed on June 4, 1934, when two men entered the bank, took $7,431.80 in cash and $10,845 in travellers' checks, bonds and other securities. They were armed with automatic revolvers, and a third man, claimed to be the defendant, remained outside standing by a Ford sedan car and when the other two men emerged with the loot immediately left in the car.

On the evening of May 30, 1934, five days before the bank robbery, a Plymouth car was stolen in Gardner, Mass., but shortly afterwards was abandoned at Royalston, Mass., about eleven miles from Gardner, and its license plates were carried off and placed on the Ford sedan that was used for the robbery and had been stolen at Haverhill, Mass., on the night of June 1, 1934. The latter car was found abandoned in Schenectady, New York, on June 6, 1934. At that time it bore New Hampshire plates which had been stolen from a car in North Walpole, about the 19th or 20th of May.

There was testimony by the foreman of a garage in Gardner where the Plymouth car was stolen, and also by a truckman there, that the defendant and a confederate, with guns in their hands, held up these witnesses, locked them into a toilet and, before they were released, carried off the car. They afterwards identified the car robbers as the defendant and Simons. The owner of the Ford sedan testified that the defendant and a confederate whom he did not identify held him up in Haverhill, Mass., on June 1, 1934, at the point of a machine gun and carried off his car which appeared by other testimony to have been the one used in the bank robbery, and also carried off his license.

Theodore Bentz, a government witness, who was the brother of Edward Bentz, one of the bank robbers, testified that on the day before the bank robbery his brother and the defendant left Portland, Maine, in a Ford or Chevrolet car. Edward Bentz testified that when he started his trip from Portland he was travelling in the Ford sedan with Simons and one Smitty. He said that he and Simons were engaged in the car robberies both at Gardner and Haverhill. They had both pleaded guilty to the bank robbery but Bentz denied that the defendant was engaged in it. The defendant was further identified by a restaurant keeper at Rochester, Vermont, a place which the robbers passed through on the night of the robbery. They had stopped there and got some refreshments. The two men that accompanied the defendant were also identified by the restaurant keeper as Edward Bentz and Simons.

Doris Crane, another government witness, testified that she was outside the bank about the time of the robbery, saw the Ford car there, identified the defendant who was standing outside of the car with his foot on the running board, and saw him with the two other men, whom she failed to identify, get into the car and "shoot out of town very quickly". She said that she learned about three minutes afterwards that something had happened at the bank. There was testimony that Edward Bentz had been a friend of her husband Eddie Doll, who was also a bank robber, and that they had all been together in Texas. She had a safe deposit box in the Danville bank from which she had removed $900 on one occasion claiming that her brother had sent her the money. Bentz testified that she, her husband and himself had counted over the proceeds of bank robberies in Portland, Oregon, and Dallas, Texas, amounting to about $36,000, a part of which went to her husband.

The only contradiction of moment in the government's testimony was between Doris Crane, who testified that she identified the defendant and saw him get into the car in front of the bank, and Bentz who denied that he was there or in any way engaged in the bank robbery. But the participation of the defendant in the robbery was not only attested directly by Doris Crane but was implicit in the testimony of the other witnesses who described his participation in holdups and car robberies at Gardner and Haverhill and linked him with the robbers in their travels from Portland, Maine, to Schenectady. The evidence of the defense was trivial and the proof of guilt overwhelming.

The attacks upon the verdict of conviction which merit discussion are based upon errors said to have been committed during the trial. The first one was the impeachment by the government of its own witness, Edward Bentz, who had been brought from the federal prison in San Francisco in order to testify. The government counsel asked Bentz whether he had not previously said that because of personal risk he would not identify any one concerned in the bank robbery. Bentz denied having made such a statement and, being asked if there was not danger of "having a knife stuck into him" if he should identify someone, replied: "It depends on the seriousness of the offense; it does happen." The questions were asked in order to show that Bentz was not telling the truth when he testified that the defendant was not engaged in the bank robbery and they plainly involved impeachment of its own witness by the government. But the testimony elicited was of little importance. The district attorney could have achieved his object as well if, without cross-examining Bentz about the reasons for not identifying the defendant, and without calling witnesses to show the reasons, he had simply argued to the jury that Bentz had denied that the defendant had anything to do with the looting of the bank or the stealing of the automobiles because he feared the consequences to himself. The existence of such a motive was inherent in the situation and without any testimony might fairly be said to account for Bentz' failure to testify that the defendant had any part in the bank robbery. A still stronger reason why the evidence about Bentz' motive for failing to identify the defendant was unimportant was the convincing proof by many disinterested witnesses, including Bentz' own brother, that the defendant had been engaged in the car robberies at Gardner and Haverhill in which Bentz admittedly participated, that he was at Portland with Bentz and Simons, and was with both of them at Rochester. Evidence is rarely adduced in a case which so inevitably establishes guilt as did the proof here. If the evidence as to Bentz' motives should have been excluded under the strict and much criticized rule against impeaching one's own witness, nevertheless its admission was of no moment for the reasons we have given. But the statement of Assistant United States Attorney Ryan that when Bentz had declined to identify the defendant as a participant in the bank robbery Bentz added: "Why don't you try him for the Brandon job? You have got a better case against him", was highly improper. The court, however, at once struck it out and instructed the jury to disregard it. As the error was immediately corrected and the defendant was shown by overwhelming proof to have been engaged in two holdups that were committed in the course of the conspiracy, the mere mention of the Brandon incident added nothing of importance to his proved criminal record and could not have affected the jury. Indeed the remark tended to suggest a weakness of the proof against Nimerick in the case at bar. Its elimination from the record, with instructions to disregard it, was a sufficient disposition of the matter.

Error was committed in admitting the pistol and shotgun which were taken from the defendant's automobile at the time of his arrest in Chicago six years after the bank robbery. They were in no way connected with the robbery but, though improperly received in evidence, were so completely irrelevant that we believe their effect was as illusory as their logical significance.

The testimony of the witness Lynch that the manager of a Chicago hotel told him that he could not identify the defendant from a photograph which was shown to him and that he had never had a guest by the name of Meyers (a name under which defendant was living in Chicago) was pure hearsay. But it only confirmed defendant's own statement to Lynch that he was not living at the hotel, and consequently was of no importance.

The defendant also assigns as error the failure of the court to charge as to "the presumption of innocence". Before the objection was raised the judge had delivered a charge in which he told the jury that:

"The burden is upon the Government to make out every essential element of each case, and that the Government must do beyond a reasonable doubt. You cannot find the defendant guilty under either of the indictments unless from all the evidence you believe him guilty beyond a reasonable doubt. * * *

"If, after an impartial consideration of all of the evidence, you can candidly say that you are not satisfied of the defendant's guilt,

then you have a reasonable doubt and you should find him 'not guilty'. But if after such impartial consideration of all of the evidence you can candidly say that you have an abiding conviction of the defendant's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs, then you have no reasonable doubt, and you should find him 'guilty'.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"If there is more than one theory in this case, and if they are equally reasonable, one leading to guilty and the other to innocence, you must adopt the one leading to innocence, because it is safer and better to believe good of a person than to believe evil of him, if you can do so on the basis which is consistent in view of all the evidence in the case. &ast; &ast; &ast;"

The foregoing charge was plainly adequate as to the necessity of proof of guilt beyond a reasonable doubt. We think that the essentials of the usual charge as to the presumption of innocence are found in the paragraph beginning with the words: "If after an impartial consideration", etc., and in the later paragraph where the jury was told that if there are two equally reasonable theories by one of which the defendant might be found guilty and by the other innocent, they "must adopt the one leading to innocence, because it is &ast; &ast; &ast; better to believe good of a person than to believe evil of him." The first paragraph indicated that the defendant was to be regarded as innocent until such time as the evidence was all in and an "abiding conviction" had been reached as to his guilt, and the later paragraph warned the jury that he must be regarded as innocent if innocence was consistent with the evidence.

It is hard to believe that the defendant's rights were not adequately protected by the foregoing charge in spite of the failure to comply literally with the customary formula.

The criticism of the charge can fairly be said to rest upon a failure of the court to charge ·as to the presumption of innocence in the following language: "The defendant is presumed to be innocent until proven guilty beyond a reasonable doubt and that this presumption is evidence in his favor and attends him throughout the trial, until such time as reached in the course of the trial—if that time is ever reached—when the jury find that this presumption

has been removed or rebutted by competent evidence."

It seems clear that the above request was properly denied. The presumption of innocence, whatever it may be, is not "evidence" in favor of the defendant. In Agnew v. United States, 165 U.S. 36, at page 51, 17 S.Ct. 235, at page 241, 41 L.Ed. 624, the Supreme Court upheld a refusal to charge that the "presumption of innocence is to be regarded by the jury &ast; &ast; &ast; as matter of evidence, to the benefit of which the party is entitled. This presumption is to be treated by you as evidence, giving rise to resulting proof, to the full extent of its legal efficacy", where the court had already charged that: "The defendant is presumed to be innocent of all the charges against him until he is proven guilty by the evidence submitted to you. This presumption remains with the defendant until such time, in the progress of the case, that you are satisfied of the guilt beyond a reasonable doubt." In Holt v. United States, 218 U.S. 245, 253, 31 S.Ct. 2, at page 6, 54 L.Ed. 1021, 20 Ann.Cas. 1138, the defendant excepted to a refusal to charge that "the presumption of innocence starts with the charge at the beginning of the trial, and goes with (the accused) until the determination of the case. This presumption of innocence is evidence in the defendant's favor". The judge gave the jury an instruction as to the presumption of innocence which omitted the statement that "this presumption of innocence is evidence in the defendant's favor." The court said, per Holmes, J.: "This was correct, and avoided a tendency in the closing sentence quoted from the request to mislead."

In the record before us not only was there no request which embodied a charge that was correct in form under the decisions of the Supreme Court we have quoted, but the judge had already told the jury that it was better to believe good of a person than to believe evil of him and that if there was a reasonable theory of the case upon which innocence might be predicated they must adopt it.

If the reasoning in Coffin v. United States, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481, still represents the opinion of the Supreme Court we should perhaps treat the refusal to charge about the presumption of innocence in the form requested as reversible error. But the later Supreme

Court cases we have cited appear to have modified, and perhaps even nullified, the views about the presumption of innocence expressed in Coffin v. United States. The more recent decisions indicate that the charge asked for would have been misleading and erroneous. With this view Thayer and Wigmore are in accord. See Preliminary Treatise on Evidence, page 551, by James B. Thayer, and Wigmore on evidence, 3d Ed., § 2511; cf. Price v. United States, 8 Cir., 218 F. 149, 153 L.R.A.1915D, 1070. For ourselves, we prefer the view of the presumption of innocence taken by Professor Thayer and recently announced by the Vermont Supreme Court in Tyrrell v. Prudential Insurance Company of America, 109 Vt. 6, 23, 192 A. 184, 115 A.L.R. 392, to that of the decisions which treat the presumption of innocence as evidence to be weighed by a jury in favor of the accused.

As we have already said, we think that the failure in the present case to give to the jury more specific instructions about the presumption of innocence caused no prejudice to the defendant when the charge is considered as a whole.

█ The defendant finally objects to the trial before the court of the issues raised by the pleas in bar on the ground that he was thereby deprived of his constitutional right to a jury trial. If upon seasonable objection, the lack of a formal consent to trial without a jury might invalidate the finding of the court that since June 5, 1934, the defendant had been living outside of the State of Vermont, and that the statute of limitations therefore was not a bar, there was no request by the defendant to submit the questions of the statute of limitations to the jury. It is now too late to raise an issue not presented in the bill of exceptions when it might have been tried out before the jury under the defendant's plea of not guilty if the latter had seasonably claimed his right. Jones v. United States, 9 Cir., 179 F. 584, 592; Greene v. United States, 5 Cir., 154 F. 401, 411.

In our opinion no error not purely technical was committed during the trial except the admission of the firearms. Any other errors in no way affected the substantial rights of the defendant. The admission of the firearms, though open to criticism, was not of sufficient importance to reverse a judgment of conviction in a case where guilt was so thoroughly established.

Decree affirmed.