470

See also 63 F.Supp. 377.

Otto Christensen and John J. Irwin, both of Los Angeles, Cal., and Otto A. Jacobs, of Santa Ana, Cal., for appellant Canella.

Forgy, Reinhaus & Forgy, of Santa Ana, Cal., for appellant McCormac.

J. E. Simpson, of Los Angeles, Cal., for appellant Wyckoff.

Charles H. Carr, and James M. Carter, U. S. Attys., and Arthur Livingston, Asst. U. S. Atty., all of Los Angeles, Cal., for appellee.

Before DENMAN, HEALY, and ORR, Circuit Judges.

ORR, Circuit Judge.

This is an appeal from a conviction upon an indictment charging in one count a single general conspiracy to defraud the United States by (1) depriving the United States of its right to have the lawful functions of the various offices held by Colonel Canella (one of the appellants here) administered free from corruption and fraud; and, (2) by depriving the United States of its right to the faithful action of Canella in the discharge of his offical duties free from corruption and fraud.

The questions presented are: (1) Whether the proof submitted to the jury conformed to the charge of a single conspiracy, or whether the proof showed several separate similar conspiracies; and (2) if there was such a variance between proof and indictment whether or not that variance constituted fatal error.

The facts, which involve numerous people, are both lengthy and complex. We, therefore, set them forth in some detail.

Appellant Canella, a Regular Army officer, reported to the Santa Ana Army Air Base, to which we shall hereafter refer as the Base, in California, on December 10, 1941, as the Post Quartermaster. As such his duties included the hiring of civilian personnel and the procuring of some of the food and other supplies used on the Base.

The record discloses that Canella and one Campbell, a Santa Ana real estate broker, became friends soon after Canella arrived at the Base, and that Canella, in conversations with Campbell, said he would be hiring many civilian employees and letting out numerous contracts for supplies at the Base but that he (Canella) was going to be paid for awarding those jobs and contracts, and that Campbell should find people who wanted jobs and who wanted to sell milk and other products and services to the army and who were willing to pay Canella for giving them these jobs and contracts. Campbell agreed.

Thus there was formed the conspiracy charged in the indictment.

The following transactions are involved:

A. *Sale of three civilian jobs:* Three civilian employees at the Base were hired by Canella under the following circumstances:[1]

(1) One Miller applied to Canella for the position of Assistant Fire Chief at the Base. There were two other applicants for this post. Canella told Campbell that Miller was not going to get the job unless Miller paid Canella $200 to $250, and that Campbell should pass this information on to Miller. Canella later told Miller that his chances for the post looked "a little worse." Thereupon Miller agreed to pay $100 for the job, gave the money to Campbell who in turn gave it to Canella. Canella

---

[1] Upon this appeal we, of course, consider the facts and evidence in the light most favorable to the Government. See

Taylor v. Mississippi, 319 U.S. 583, 585-6, 63 S.Ct. 1200, 87 L.Ed. 1600.

then appointed Miller over a veteran applicant with a higher civil service rating for the position than Miller.

(2) One Jensen inquired of Campbell whether Jensen's brother, Anton, could get a job at the Base as an electrician. Campbell, after talking with Canella, told Anton Jensen he could have a job if he would pay $100 for it. Campbell sent Anton Jensen to Canella's office, having previously told Canella that Jensen would pay for the job. Canella hired Jensen, who then paid Campbell $100. Campbell turned this over to Canella.

(3) Campbell, at the request of a friend, took one Elliott to Canella's office to talk about a job as painter on the Base. Elliott was not employed then but was told to come back. Before he returned to the Base Elliott borrowed $50 and paid this to Campbell who in turn gave it to Canella. On Elliott's next visit to Canella's office he was employed as a painter.

Miller, Jensen, Elliott and Campbell were all described as co-conspirators in the indictment, but none of them was indicted. There was no evidence to indicate Miller, Jensen or Elliott knew of the other's transactions with Campbell and Canella, nor that they knew of any of the transactions set out below.

B. *The Excelsior Creamery Company Milk contract transactions.*

When the Campbell-Canella conspiracy was formed, Canella asked Campbell to find people who would be interested in paying a percentage of the gross profits to obtain the contract to supply milk and dairy products, among other items, to the Base. Campbell, after unsuccessfully approaching one Todd, who operated a dairy in Santa Ana, interviewed officials of the Excelsior Creamery Company sometime between February 11 and 15, 1942.

Appellant Wyckoff, plant superintendent and wholesale sales manager of this concern, had previously inquired of army personnel as to how his company could obtain business when the Base was opened. He had been introduced to Canella and they had discussed the procedure of submitting bids and prices.

Until May 1942 the milk contracts were awarded by a system of competitive, sealed bidding. After May 1942 the contracts were awarded by negotiation. On February 6, 1942, Excelsior put in its first bid for business at the Base, and although all the bids opened were tied, Arden Farms, a competitor of Excelsior, was awarded the contract. Thus, it was shortly after Excelsior lost its first contract at the Base that Campbell approached them, saying that he knew "a fellow who had authority" to give them the milk and dairy products contract if they were willing to pay for it. Wyckoff and Ranney[2] asked if 2% of the gross business a month would be satisfactory, and Campbell, after reporting the proposition to Canella and receiving the latter's acquiescence, reported to Ranney and Wyckoff that 2% would be agreeable.

Campbell also told them that "his man" at the Base would have access to all bids before they were opened and that he could thus tell Excelsior what they would have to bid on the various dairy products[3] in order to win the contracts for the succeeding months. Campbell then obtained the figures for the next bid, gave them to Excelsior, and on February 17, 1942 Excelsior won the contract for the March business because it was low bidder on cream, buttermilk and cottage cheese. Excelsior's bid on ice cream was considered and accepted despite the fact that it was an "alternate bid." The army's request for bids expressly declared "alternate bids" would not be considered.

In March Excelsior's bid for the April business was the same as Arden Farms, but because Arden put in an "alternate bid" it was not recognized and Excelsior won the April contract despite the fact that Excelsior's alternate bid had won the preceding month.

---

[2] Ranney was indicted and went on trial in the lower court but the Government dismissed as to him due to his illness during the trial.

[3] The milk price bid would of necessity be the same for each bidder since that price was set by the State Department of Agriculture. Therefore, the bid on cream, buttermilk, ice cream, etc., would be the determining factor.

In April Arden delayed bringing in its bid for the May contract until a few minutes before the bids were to be opened and because it bid an unheard of low price on ice cream Arden won the May contract. In May Arden and Excelsior turned in identical bids but Excelsior won the June contract.

From June on, changed army regulations permitted contracts to be awarded by negotiation rather than competitive bidding and Excelsior and Arden, and later other dairies (when the demand exceeded Excelsior's and Arden's capacity) divided the business at the Base.

The evidence as to Excelsior's payments to Canella for his services in connection with the award of these contracts was as follows:

After Excelsior won the March contract, Canella told Campbell he needed some money and wanted an advance payment. Campbell said he went to the creamery offices and that either Wyckoff or Ranney gave him an envelope with some cash and Campbell gave this to Canella. At the end of March the balance due on the basis of 2% of Excelsior's gross sales to the Base was given Campbell in the same way, with a slip in the envelope showing the amount of business done at the Base for that month.

The month that Excelsior failed to win the bid it nevertheless paid a small amount "to keep up their agreement."

Each month thereafter until May 1943, Campbell went to the Excelsior plant and received the money for Canella. On two occasions Wyckoff sent Campbell down to get the money from appellant McCormac who was cashier and wholesale accounts receivable bookkeeper of Excelsior.

Campbell never signed a receipt for any of those sums. McCormac kept a record of the monthly payments in a small notebook kept entirely separate from the other books of Excelsior and of a ranch company owned and operated by Excelsior. The notebook showed "cash paid to Campbell as commissions" on one side, with a total amount of $7,092.98 indicated as paid to Campbell. On the other side the book showed as "cash received" items sold by the ranch company and amounts received therefrom. These amounts covered approximately the same dates as the payments to Campbell and the amounts of cash received exactly equalled the amounts paid to Campbell.

Although Excelsior and the ranch company kept a standard, customary set of business books, the transactions recorded in the small notebook kept by McCormac do not appear elsewhere in any of those books and there is no other record of the sale by the ranch company of the items listed in the notebook nor of the receipt of any money from those sales. Loose sheets in the book showed Excelsior's sales to the Base from March 1942 to May 21, 1943, and it was from these figures that the 2% paid Canella through Campbell was computed.

The notebook was never seen by Excelsior's regular bookkeeper and the cost accountant did not figure the cost of Campbell's commissions into the cost of the dairy's products, yet he did for other salesmen.[4]

In May 1943 Wyckoff told Campbell that Canella had inspected the creamery and had told him that, due to the pendency of a trial involving one Berman, he (Canella) did not want any more payments. The final payment was made on May 21, 1943.

In January 1944 when the Federal Bureau of Investigation was investigating the case, Wyckoff, McCormac and Ranney all signed categorical statements denying any payments to, or dealings with Campbell of any kind, McCormac going so far as to deny he had ever seen Campbell in the Excelsior's offices.

There was no evidence connecting Wyckoff and McCormac with Miller, Jensen or Elliott, and no evidence that Wyckoff or McCormac knew of Campbell and Canella's transactions with Miller, Jensen, Elliott or of the transactions set out below.

C. *Enlistment assistance.*

In November 1942 one Ahmann was

---

[4] Appellant's version is that Campbell was hired as a bona fide salesman because of his ability to get business and that the record of payments to him was kept in such an unusual and secret fashion so as not to excite the envy of the other salesmen receiving less than Campbell.

scheduled to be drafted into the army and his cousin asked Campbell what could be done. Ahmann wished to be assigned to the Base and was informed that this could be accomplished if he enlisted as a cook. There is evidence in the record from which the jury could infer that Canella had asked first $50 and later $100 for his assistance in securing the enlistment of Ahmann, this to consist of recommending Ahmann to enlisting officers at the Base. Ahmann failed to pass his physical examination and no payment was made to Canella or Campbell. It was no part of Canella's duties to enlist persons into the army although he testified that he had enlisted about 100 persons while at Santa Ana. It was shown that he had called other officers and recommended Ahmann.

There is no evidence connecting Ahmann with, or indicating that Ahmann knew of, Miller, Jensen, Elliott or Wyckoff or McCormac.

### D. Post Exchange Contracts.

In addition to his other duties Canella was presiding member of the Post Exchange Council, the body which supervises the Post Exchanges (stores where items of convenience and necessity are sold to military personnel) at the Base. The Council at Santa Ana was organized on March 10, 1942. The Post Exchange made contracts with various concessionaires for barber shops, shoe-shine stands, etc. The prices charged to army personnel by these concessionaires were subject to the approval of the Council.

In this connection it is alleged that one Mock had previously secured the barber shop and shoe-shining concession at the Base. There was evidence that Canella frequently approached Mock and demanded that Mock pay his (Canella's) income tax inasmuch as Canella was instrumental in having Mock get the concession. Canella also attempted to buy a $2,000 interest in the concession but Mock refused to sell.

In October 1943 Canella and Mock became involved in a public altercation at a country club during which Canella told Mock that he knew the latter had made $5700 that month from his concession and that he (Canella) "wanted a cut of it" and further, if Mock did not give it to him, that he (Canella) would have Mock "thrown off the field."

### E. Attempted sale of shoe repair contract.

There was evidence that Canella had asked Campbell to "see someone" about the shoe repair contract (which was let by the Post Quartermaster's Office). Campbell then asked one Mounce if the latter wanted the shoe repair contract at the Base. Campbell also showed Mounce a paper on which the prices appeared which Mounce would have to bid to get the contract. Mounce was not interested and nothing further was done.

### F. Canella's Financial Condition.

The record discloses that Canella increased his savings by over $5100 in 1942, that during that year Campbell had given him over $4200.

In 1943 Canella showed a gain of over $3200 and during that year Campbell paid him approximately $3,000.

The trial court admitted all of the above evidence but provisionally limited each transaction to the defendants involved therein. At the conclusion of the Government's case the court granted the Government's motion to apply all the testimony, with certain exceptions noted below,[5] to each defendant. Thus, evidence as to the sale of civilian jobs to Miller, Elliott and Jensen, evidence as to the corrupt attempt to aid Ahmann's enlistment, evidence as to Canella's attempts to get Mock to join the conspiracy, and evidence of the attempted corrupt sale of the shoe repair contract was admitted against all appellants.

Appellant Canella filed a plea in bar to the jurisdiction of the trial court on the

[5] Evidence of Canella's financial condition was limited to him alone, and evidence relating to preliminary conversations between Campbell and Canella and the conversations in which the conspiracy was entered into by Campbell and Canella were limited to the persons present at those conversations. The evidence as to McCormac and Wyckoff's statements to the F.B.I. was limited to them.

ground that the trial court lacked jurisdiction to try an army officer and that trial of an army officer by a civil court was a denial of due process, which was denied.

*The case of Wyckoff and McCormac:*

Appellants Wyckoff and McCormac assail the judgments against them on numerous grounds of which they urge most strongly:

1. That the evidence showed not one conspiracy as charged in the indictment, but several separate conspiracies, thus resulting in a fatal variance.

2. That the court erred in applying to them all of the Government's evidence against Canella.

3. That the evidence was insufficient to prove they were parties to the conspiracy.

The trial court, in granting the Government's motion to apply to Wyckoff and McCormac all the evidence against Canella,[6] proceeded on the theory that the indictment charged but one conspiracy to defraud the United States. The trial court, in his instructions, asked the jury to decide (1) if there was *a* conspiracy as charged; and (2), if there was such *a* conspiracy whether each defendant was a party to it. The court then carefully instructed the jury that they must find that both Wyckoff and McCormac had knowledge of the existence and purposes of *the* conspiracy between Canella and Campbell before they could find Wyckoff and McCormac guilty.

■ The trial proceeded on the theory that the single conspiracy charged could be established by evidence of transactions between Canella and Campbell with conspirators whose common purpose with Wyckoff and McCormac had not been shown. We think that failure to establish this common purpose left each of the transactions between Canella and Campbell and parties other than Wyckoff and McCormac, independent of them and without their knowledge, separate conspiracies, a minimum of five of which appear, namely: Canella and Campbell's conspiracy (1) with Miller, (2) with Jensen, (3) with Elliott, (4) with Ahmann, and (5) with McCormac, Wyckoff and Ranney. In addition, the record discloses that Canella and Campbell (6) attempted to sell the shoe repair contract to Mounce, and (7) attempted to sell the milk contract to Todd. Finally there was evidence of attempts by Canella to induce Mock to conspire with Canella and Campbell.

The pattern of these conspiracies was "separate spokes meeting at a common center," but, (since there was no evidence connecting McCormac and Wyckoff with the other incidents, or spokes) without a rim to enclose these separate spokes. Kotteakos v. United States, 66 S.Ct. 1239, 1243.

■ The theory of the trial court here and of the trial court in the Kotteakos case,[7] was that all the evidence relating to all the separate spokes in the wheel was admissible against McCormac and Wyckoff and was relevant to the charge of a single conspiracy because of the general rule that when one joins an existing conspiracy, he "takes it over as it is" and becomes liable for all that has gone before or may happen later.[8] However, "to bring this rule into operation it is not enough that, when one joins with another in a criminal venture, he knows that his confederate is engaged in other criminal undertakings with other persons, even though they be of the same general nature. The acts and declarations of confederates, past or future, are never competent against a party except in so far as they are steps in furtherance of a purpose common to him and them. Declarations * * * become competent only when they are uttered in order to accomplish the common purpose." See note 7.

The view taken at the trial here, as in the trial of Kotteakos v. United States, (see note 7) "confuses the common purpose of a single enterprise with the sev-

6 With the exceptions set forth in Note 5.

7 United States v. Lekacos, 2 Cir., 151 F.2d 170, 172, reversed, sub. nom., Kotteakos v. United States, 66 S.Ct. 1239. This case was decided subsequent to the trial of the instant case.

8 Craig v. United States, 9 Cir., 81 F. 2d 816, 822, certiorari denied 298 U. S. 690, 56 S.Ct. 959, 80 L.Ed. 1408; Coates v. United States, 9 Cir., 59 F.2d 173, 174; United States v. Manton, 2 Cir., 107 F.2d 834, 848, certiorari denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012.

eral, though similar, purposes of numerous separate adventures of like character." 66 S.Ct. 1250.

Here there was no purpose common to Wyckoff or McCormac and Miller, nor to Wyckoff or McCormac and Elliott, or any of the others whose acts formed separate spokes in this rimless wheel; nor was there any evidence connecting McCormac and Wyckoff with the other conspirators.[9]

In United States v. Manton, 2 Cir., 107 F.2d 834, 848, the Second Circuit Court of Appeals, referring to the question of whether Spector had become a party to the conspiracy, said:

"It is not required that each of the conspirators shall participate in, or have knowledge of, all its operations. He may join at any point in its progress and be held responsible for all that may be or has been done."

But in the Manton case, as the court points out:

"The trial judge was careful to tell the jury that they must confine themselves, in passing upon the question of Spector's guilt or innocence, to the evidence which related to him, without reference to that which related only to the defendant Manton; and that they were to limit their consideration to the facts of the Schick case with which the testimony connected Spector. Thus the attention of the jury was pointedly directed and confined to the specific facts relating to Spector." 107 F.2d 849.

Here, precisely the opposite ruling was given. All the evidence, with certain minor exceptions already noted, was applied against all appellants on the theory that they had joined a single conspiracy. Yet, as we have stated, there could be no finding of a single conspiracy on the evidence presented, and, consequently, a variance existed between the indictment and the proof.

■ It does not follow as a matter of course that such a variance is fatal. "The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314.

Until June 10th of this year it could have been concluded from the holding of the Berger case, supra, that where more than one conspiracy was proved with but one alleged such a variance was not fatal under the harmless error statute.[10] But on June 10, 1946, the Supreme Court, in Kotteakos v. United States, 66 S.Ct. 1239, while not overruling the Berger case, strictly limited that holding and decided that where one conspiracy was charged and eight separate similar conspiracies were proved, the variance was fatal and required reversal.

In the Kotteakos case the eight conspiracies involved were eight separate groups of persons for whom one Brown fraudulently secured loans under the National Housing Act. None of these eight groups had any connection with each other, although all dealt independently with Brown. It was the eight separate groups which the Supreme Court referred to as "spokes meeting at the common center" (Brown). Three persons of one of these eight groups were the appellants whose conviction the Supreme Court reversed. The Second Circuit Court of Appeals had held that the convictions should be affirmed despite the plain error of supposing a single conspiracy could be made out on the evidence and of admitting all the evidence as to the seven other groups' dealings with Brown, since they considered this error was not prejudicial to the three appellants.[11] It was

[9] The Government contends that Campbell told Wyckoff he was representing other companies at the Base and getting contracts for them too. The Government argues that "each one who dealt illegally with Canella through Campbell undoubtedly knew that Canella was not limiting his unlawful activities to their particular job or enterprise; that if he would take money for their employment he would take it from the next applicant as well." But this is merely conjectural and speculative and is not sufficient to give rise to an inference that Wyckoff and McCormac were engaged in a general conspiracy with Campbell and Canella.

[10] § 269 of the Judicial Code, 28 U.S. C.A. § 391.

[11] United States v. Lekacos, 2 Cir., 151 F.2d 170, reversed, sub. nom. Kotteakos v. United States, 66 S.Ct. 1239.

on the question of whether the error was prejudicial that the Supreme Court differed from the Second Circuit Court of Appeals.

The Supreme Court distinguished its earlier ruling in the Berger case, supra, on the sole ground that in the Kotteakos case there were eight conspiracies proved involving originally 32 persons, whereas in the Berger case there were two conspiracies proved involving four persons: "The sheer difference in numbers, both of defendants and of conspiracies proven, distinguishes the situation." 66 S.Ct. 1249.

In the instant case there are at least five separate conspiracies. In the Berger case, supra, the Supreme Court stated that the objection to proving several separate conspiracies where only one is alleged, was not that the indictment did not describe the particular conspiracy of which the defendant was convicted, but that the Government's proof included more. (295 U.S. 81, 55 S. Ct. 629, 79 L.Ed. 1314). The court there held that there was nothing to show Berger had been prejudiced or surprised and consequently refused to reverse his conviction on that ground.

But in Kotteakos v. U. S., supra, the Supreme Court found that the burden of defending a person connected with only one of so many separate transactions was far greater than when only two transactions were involved as in the Berger case. This "sheer difference in numbers" (66 S.Ct. 1249) was crucial since "numbers are vitally important in trial, especially in criminal matters. * * * When many conspire, they invite mass trial by their conduct. * * * [but] wholly different is it with those who join together with only a few * * *. Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it." 66 S.Ct. 1252.

The court further held that the harmless error statute[12] does not permit the Government to hold a common trial for eight or more separate and distinct crimes "when the only nexus among them lies in the fact that one man participated in all" (66 S.Ct. 1252), since when the evidence of all the crimes is admitted as against all defendants "the dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." 66 S.Ct. 1252. The Supreme Court goes on to say: "Whether or not Berger marks the limit, for this sort of error and case, we are clear that it must lie somewhere between that case and this one." 66 S.Ct. 1252.

■ The instant case, with five conspiracies involving at least 12 persons, "lies somewhere between" Berger v. United States and Kotteakos v. United States, and we are unable to say that "prejudice to the substantial rights" of Wyckoff, and McCormac has not taken place For even though here, as the Second Circuit Court of Appeals found in the Kotteakos case, the evidence concerning Wyckoff and McCormac disclosed that each shared in the fraudulent phase of the conspiracy in which they participated; and even though their convictions, had they been obtained in separate trials or on an indictment with separate counts, could not have been disturbed, it appears "highly probable that the error [of mass trial] had substantial and injurious effects or influence in determining the jury's verdict." 66 S.Ct. 1253.

*The Case of Canella.*

■ But the foregoing considerations have no application to the appeal of Canella. Canella was the common center into which the various spokes of these conspiracies ran. He was the nexus of this case, the key figure who participated in every one of the seven conspiracies and who repeatedly urged Mock to join the conspiracy. The Supreme Court's finding in the Kotteakos case did not extend to Brown, the key figure of the conspiracies, who pleaded guilty. The Supreme Court there was concerned only lest those who committed the offense by conspiring with Brown should be convicted upon evidence that others, with whom they had no connection, had also conspired with Brown. But all of that evidence could not prejudice Brown, nor did it prejudice Canella here. He partici-

---

[12] See note 10.

pated in all of the incidents. There was no chance of "transference of guilt from one to another" in the case of Canella; no chance that the jury could convict Canella on testimony involving only Wyckoff or McCormac. It is true a variance existed between the indictment and the proof as to Canella as in the case of McCormac and Wyckoff; but as we have pointed out, it is not the variance that is determinative. A reversal is required only if such variance has in some way affected appellant's substantial rights and we fail to find such a condition existing in this case.

Canella assails his conviction on several other grounds, which so far as it is necessary to consider them, may be summarized as follows:

1. The trial court failed to instruct the jury properly concerning the presumption of innocence and other presumptions in favor of an accused.

2. The trial court erred in admitting evidence of the Ahmann enlistment incident.

3. The trial court erred in admitting evidence of Canella's attempts to induce Mock to join the conspiracy and evidence of Canella's altercations with Mock.

4. The trial court improperly excluded a defense exhibit showing the sales of a competitor of the Excelsior Creamery Company.

5. Military courts have exclusive jurisdiction to try Canella and he was "deprived of due process of military law" by his trial by a civil court.

*First*: Canella's contention is that the trial court's instruction on the presumption of innocence was insufficient and that this fault was not cured by other instructions relating to the burden of proof resting upon the Government.

The court's instruction on presumption of innocence was as follows:

"The law does not require any defendant to prove his innocence, which in many cases, might be impossible, but, on the contrary, the law requires the Government to establish his guilt by legal evidence and beyond a reasonable doubt.

"The presumption of innocence with which the defendant is, at all times, clothed is not a mere form to be disregarded by you at pleasure. It is an essential, substantial part of the law and is binding on you in this case."

The court then gave a complete and unchallenged set of instructions on burden of proof and on reasonable doubt. Appellants' requested instructions defining the presumption of innocence with more particularity than that given by the court were properly refused.

The jury was told that the law did not require any defendant to prove his innocence; that a defendant was *at all times* clothed with a presumption of innocence, and that this presumption was an "essential, substantial part of the law" binding on the jury. The jury was also told that if they could reconcile the evidence on any reasonable hypothesis consistent with defendant's innocence they should do so. The jury was thus informed of the existence of the presumption, its persistence and its effect.

These instructions, coupled with the charge on reasonable doubt and burden of proof, amply protected the rights of Canella. United States v. Nimerick, 2 Cir., 118 F.2d 464, 152 A.L.R. 620, certiorari denied 313 U.S. 592, 61 S.Ct. 1117, 85 L.Ed. 1546; United States v. Newman, 2 Cir., 143 F.2d 389, 390.

In the latter case the court said:

" * * * The charge as to reasonable doubt certainly covered the question as to the burden of proof; and, if there still remains some mystic difference between the presumption of innocence and the burden of proof, it is at least impalpable enough to require an accused to bring the omission to the judge's attention. Conviction affirmed."

It is true that the "omission" here was brought to the trial judge's attention by the request for additional instructions but that does not alter the fact that the instructions given covered all the necessary elements of the presumption.

Regardless of whether Coffin v. United States, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481, relied on by Canella, has been over-

ruled[13] the Coffin case is not controlling since the Supreme Court in the Coffin case found that the trial judge refused to instruct as to the presumption of innocence (156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481) whereas here the trial court's instruction on presumption of innocence coupled with his charge on reasonable doubt and burden of proof constitute a fully adequate statement of the law.

It is also argued that other presumptions arising in favor of the accused were not properly presented to the jury. Canella (and the other appellants) requested detailed instructions on various transactions to the effect that in each case there was no presumption that those particular transactions were fraudulent or unlawful, but on the contrary that the law presumed such things were done lawfully and for an honest purpose and that each person was presumed to have performed his official duty properly.

Instead of particularizing to the extent called for in the requested instructions the trial court charged:

"The presumption of regularity of performance of official duty is evidence and continues unless and until it is overcome by clear evidence to the contrary."

This was an instruction in the exact language requested by appellants.

The court also charged that it was a lawful business to sell goods to the United States and that it was lawful to hire brokers to represent sellers of goods to the United States.

 No objection is made that the instructions given on this point were not correct; the contention is only that they were not sufficiently detailed to convey to a jury the full meaning of the presumptions. We do not agree. The instructions covered the substance of the requests, correctly stated the law and adequately protected the rights of Canella. It is not necessary to particularize on part of the evidence when general instructions are correct.[14]

*Second:* Canella contends that the admission of evidence of the Ahmann enlistment incident was error because the evidence was not related to the conspiracy alleged and because that evidence had no tendency to support the charge. He argues at considerable length that the indictment charged that the United States was being deprived of its right to have the offices of Post Quartermaster, officer of the United States and President of the Post Exchange Counsel properly administered; that as Canella had no official duty to enlist men in the army, the evidence relating to his aiding Ahmann to enlist and be stationed at the Base for $100 should have been rejected since it does not tend to prove the conspiracy and because it was "mostly hearsay" and highly prejudicial.

 True the indictment charged a conspiracy to deprive the United States of its right to have the office of "officer of the United States, exercised and administered free from corruption, fraud, impairment and obstruction" and of its right to the disinterested, unbiased judgment and action of Canella in the discharge of his official duties as an officer of the United States free from corruption and fraud. [Cr.Code, § 117, 18 U.S.C.A. § 207.] We think evidence from which the jury could infer that a Colonel in the Army of the United States conspired to obtain $50 or $100 from Ahmann, a man about to be drafted into the army, for lending the influence of his official position and the weight of his rank to a recommendation to officers inferior in rank to himself that Ahmann be enlisted, is so clearly relevant to the charge as not to require discussion or citation of authorities. If the United States is not being deprived of its right to the unbiased action of an officer of the United States army in the discharge of his official duty when that officer is paid money to recommend a man for enlistment it is

---

13 Cf. Agnew v. United States, 165 U. S. 36, 17 S.Ct. 235, 41 L.Ed. 624, with Holt v. United States, 218 U.S. 245, 253, 31 S.Ct. 2, 54 L.Ed. 1021, 20 Ann.Cas. 1138, and United States v. Nimerick, supra.

14 White v. United States, 164 U.S. 100, 104-5, 17 S.Ct. 38, 41 L.Ed. 365; United States v. Groopman, 2 Cir., 147 F.2d 782, 785.

hard to conceive of a case where the United States could be deprived of that right. Canella apparently overlooks the fact that whenever officers of the United States army take any action whatever in regard to the army their official duties are involved. The United States is entitled to army officers who do not corruptly sell their recommendations to anyone on any subject.

*Third:* Appellant also contends the evidence of his altercation with Mock at the country club and of his attempts to buy an interest in Mock's concession and of his attempts to get Mock to pay his taxes, should have been rejected as not tending to prove or disprove any of the issues of the case. It is also urged that this evidence shows independent acts of extortion and not acts in furtherance of the objects of the conspiracy charged.

The court admitted the testimony on the ground that the series of incidents wherein Canella tried to get part of the profits of this concession from Mock and the culminating altercation was relevant to the charge of corruptly influencing Canella, since it was alleged that Canella himself was attempting to induce others to join the conspiracy. The court also based his ruling on the grounds that this evidence was admissible (1) as bearing on intent, (2) in proof of one of the overt acts, and, (3) as bearing on the allegations of the indictment. We find that to be a correct ruling based on a proper application of the law of evidence.

Appellant also contends that as this evidence relates to post exchange concessions it does not show a conspiracy to defraud the United States, the argument being that post exchanges are not instrumentalities of the United States. The holding of the Supreme Court in the case of Standard Oil Co. v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611, seems to have settled this point adversely to appellant's contention. The attempts of Canella to induce the owner of the barber shop concession at a post exchange to share the profits with the senior member of the Post Exchange Council (Canella) is within the scope of an indictment charging a conspiracy to defraud the United States by depriving the United States of its rights to the "conscientious, faithful, disinterested and unbiased judgment and action of" Canella "in the discharge of his official duties * * * as president and senior member of the Post Exchange Council, *and as an officer of the United States,* free from corruption, partiality, improper influence, dishonesty and fraud; * * *." (Italics ours)

Canella also argues that the evidence merely shows naked attempts of extortion and not solicitations to join the conspiracy, but the jury could infer that by seeking to share in the profits of the barber shop concession Canella was acting in furtherance of the conspiracy alleged in that he was impliedly promising to use his official position as president of the Exchange Council to help prevent cancellation of the barber shop concession.

It is also alleged that the country club altercation constituted mere threats by Canella to "throw Mock off the field" if he did not share his profits with Canella and hence the evidence showed threats of injury, the antithesis of solicitation. The actual threat came only after a further solicitation to let Canella share in Mock's profits and was but one part of the entire final conversation. Further, we think the trial court was correct in holding it admissible as probative of bad and corrupt intent for Canella's part and in his statement that this culminating scene merely carried out "the series of incidents which might be interpreted as an attempt on the part of Colonel Canella to cut into the profits". This altercation and the threats made merely show the extent to which Canella was prepared to go to further the conspiracy to prostitute his services and thus defraud the United States.

*Fourth:* Canella urges that the rejection by the trial court of a defense exhibit showing the summary of sales by Arden Farms Company, a competitor of the Excelsior Creamery, to various units on the Base during the period when Canella was corruptly favoring Excelsior, also was erroneous. The defense sought to prove by the exhibit that during this period Arden received considerably more business from the Base than did Excelsior.

The trial court rejected the proffered summary as irrelevant and not tending to prove any issues in the case. Appellants contend that the exhibit was competent to refute the Government's evidence that Canella corruptly favored Excelsior since it would show that Excelsior's competitor received more business than Excelsior from the Base.

But the evidence prior to the time the exhibit was offered showed that when Canella was authorized to negotiate contracts rather than hold competitive bidding, he told Excelsior and Arden to divide the business between them as they saw fit and that this was done; and that there were as many as five companies supplying the Base with dairy products at one time, after the population of the Base increased beyond Arden and Excelsior's capacity to supply it.

Therefore, we think the trial court was correct in refusing to encumber the record with the exhibit since it contained the record of Arden's sales to units on the Base over which Canella had no control, and since Excelsior and Arden had themselves arranged their division of business, so that even if the exhibit showed Arden was selling four times as much milk to the Base as Excelsior that would not tend to prove or disprove any issue in the case. Furthermore, even Arden and Excelsior together, operating at full capacity, could not supply the Base's needs, so if the exhibit did show greater sales by Arden that only would tend to prove Arden had greater capacity than Excelsior.

*Fifth:* Finally, Canella renews his contention that the trial court was without jurisdiction to try him since he is an officer of the United States army.

Substantially the same questions raised here on this point were decided adversely to Canella in the case of United States v. Canella, D.C.S.D.Cal., 63 F.Supp. 377. We consider the conclusion reached in that case to be correct. It is a well reasoned opinion, well supported by citation of authority and amply demonstrates that the contention has no merit.

Other contentions have been made. We have considered them and find them to be without merit.

The judgment as to Wyckoff and McCormac is reversed.

The judgment as to Canella is affirmed.