**CARRIGAN v. UNITED STATES.**

**CALMES v. UNITED STATES.**

**DAVIDSON v. UNITED STATES.**

No. 13118.

United States Court of Appeals,
Ninth Circuit.

July 2, 1952.

Rehearing Denied Aug. 4, 1952.

Leslie C. Gillen, San Francisco, Cal., James E. Burns, San Francisco, Cal., Clifton Hildebrand, Oakland, Cal., Joseph R. Deasy, Oakland, Cal., for appellant.

Chauncey Tramutolo, U. S. Atty., Macklin Fleming, Asst. U. S. Atty., James B. O'Grady, Asst. U. S. Atty., San Francisco, Cal. (James M. McInerney, Asst. Atty. Gen., Beatrice Rosenberg, Washington, D. C., Edward S. Szukelewicz, Attorneys, Brooklyn, N. Y., Department of Justice, of counsel), for appellee.

Before MATHEWS, STEPHENS and ORR, Circuit Judges.

ORR, Circuit Judge.

Appellants Carrigan, Calmes and Davidson (known as Jack Reynolds) separately appeal from a judgment of conviction on a charge of a conspiracy to defraud the United States, as defined in 18 U.S.C.A. § 371.

Notwithstanding appellants' separate appeals they have common grounds of complaint, viz., that the general conspiracy alleged in the indictment was not proved and that the Court misdirected the jury.

At all times pertinent, one Phil Davis stood convicted of a crime against the United States; Church was an employee of Davis; Carrigan was a United States Marshal; Calmes was a deputy United States Marshal, and Davidson an acquaintance of Carrigan.

It is urged by appellant Carrigan that there is no substantial evidence of (a) a continuing conspiracy from on or about January 27, 1951, up to and including April 15, 1951; (b) a conspiracy existing on or before January 27, 1951; (c) a conspiracy to which the appellant Carrigan was a party on or before March 26, 1951; (d) a conspiracy to which any of those named in the indictment as co-conspirators, other than Davis and Church and appellant Calmes and Carrigan, were parties after March 26, 1951.

In substance the foregoing points up appellant Calmes' position, and appellant Davidson also urges lack of substantial evidence to sustain his conviction of a general conspiracy as well as objection to instructions given other than those complained of by Carrigan and Calmes.

In essence, the argument as to the insufficiency of the evidence is that at most it establishes no more than separate conspiracies, and no concession is made in that respect.

The case of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, and the case of Canella v. United States, 9 Cir., 157 F.2d 470, are relied on by appellants as sustaining their view. Of course those cases say no more than that a conviction will not be sustained where the Government strings together for common trial several separate and distinct conspiracies where the only connection between them is that one man participated in all. We think the evidence in the instant case does more than to disclose a "conglomeration of separate and distinct offenses," and for support of our conclusion we take a look at the record.

A reading of the record leaves the distinct impact upon the unbiased mind that a man of wealth has been convicted of a crime and that the selection of his place of confinement has been placed in the hands of designing men desirous of obtaining some of the prisoner's wealth and unscrupulous as to the methods to be employed. Such was the intention of Carrigan and Calmes in January 1951 when Calmes, a deputy United States Marshal, and unquestionably the agent of Carrigan, his superior, visited Davis' place of business. The purpose of the visits by Calmes was to arrange a meeting between Carrigan and Davis, he, Calmes, representing that Carrigan was interested in purchasing a new car. Calmes suggested that Davis make a "deal" with Carrigan for a new Chrysler reminding him that regardless of the Director of Prisons Carrigan would have control over Davis and his custody; that there were good and bad prisons to which Davis could be remanded and that Carrigan would be a good connection for Davis in the circumstances. On January 27 Calmes and Carrigan visited Davis' place of business and discussed purchase of an automobile for Carrigan with Church, manager of the automobile business, Davis being out of town. Carrigan suggested a trade, car for car, of his 1947 Pontiac, valued by Church at $1150 for trade-in purposes, for a new Chrysler with a list price of $3025, again reminding Church that he would have custody of Davis after he was arrested. After Carrigan departed,

Calmes, prior to his leaving, urged upon Church the advisability of making "that deal" with Carrigan. Subsequent to learning of the suggested car deal Davis became apprehensive of mistreatment and of removal from any local prison in which he might be confined. Several days later Davis was referred to appellant Davidson as a man who might be able to make an arrangement for him whereby he would be secure in a local jail. At a meeting between Davis and Davidson, Davidson proposed a deal for Davis which he claimed was possible only through Carrigan's intercession and because he was a close friend of Carrigan. The proposal was for Davis to pay $200 a month in consideration of imprisonment at Fairfield, a local jail, and various special privileges while in custody there. Davis agreed. In the middle of February Davidson informed Davis that Carrigan had decided Davis should serve his sentence at Santa Rita, another local jail, because, as Davidson alleged, Carrigan had good connections there and Davidson was a close friend of the sheriff. At that meeting Davidson also told Davis that he would notify him of the details and date for his surrender to the marshal. On March 5, 1951 Davidson informed Davis he would have to surrender on March 7 (Davis' petition for certiorari having been denied) and made detailed arrangements for the surrender. At the agreed time and place Calmes appeared to take Davis into custody. Davis was placed in Santa Rita. After serving several days at Santa Rita Davis instructed Church to call off his arrangement with Davidson because he was not receiving the special privileges promised. Subsequently, Davidson visited Davis at Santa Rita and demanded a $500 payment for Carrigan immediately, and threatened that Davis would be sent to McNeil Island shortly unless he made the payment; Carrigan was represented by Davidson as being angry because he had received no money. The $500 was paid but subsequently Davidson demanded another $500 for Carrigan and assured Church that no further demands for money would be made. Davis refused to accede to Davidson's demand and Davidson returned the payment that had been made, telling

Church that orders had been issued for Davis' removal from Santa Rita the day before. On the next day, in a conversation with Church, Davidson told him that he was "through" with Davis. On March 30 a deputy marshal, acting under Carrigan's orders, instructed the sheriff's office to prepare Davis for transfer to McNeil Island within three days, although no orders for the transfer had in fact been issued and Carrigan probably had no power to do so. Davis and Church had previously, on March 26, contacted the Federal Bureau of Investigation and were acting pursuant to instructions from that time on. Calmes later visited Davis on April 10 at Santa Rita, told him that through his intervention Davis was being moved not to McNeil Island but to Fairfield and demanded a new car for Carrigan in exchange for the latter's used car and $500 in cash for Calmes. Davis offered to pay the money requested if he could remain at Santa Rita unmolested. Subsequently, Calmes reported to Church that Carrigan wanted $2000 and made arrangements for Carrigan to meet Church and receive the payment. As Church handed him the $2000 at the appointed time and place Carrigan was arrested by agents of the Federal Bureau of Investigation.

■ The evidence detailed above sufficiently discloses a single over-all scheme in which all of the appellants participated. The inception of the conspiracy was Carrigan's and Calmes' visits to Davis' automobile establishment. It demonstrates that Carrigan and Calmes working together had determined to use the power of the United States marshal, both in procuring special benefits for Davis as well as in threatening official reprisal, as a means of securing economic gain from Davis. First, Davis' agreement to an automobile exchange completely without economic justification from Davis' point of view was sought. That scheme failing, the purpose continued though the means of attainment varied. Failure of the automobile exchange caused the conspirators to use less subtle techniques to achieve their illicit object, until we find Carrigan ultimately agreeing to meet Church on a city street to receive a $2000 payment. It seems clear that Carrigan and Calmes were determined to secure benefits by intimidating Davis and that the form of "payoff" finally agreed upon was merely collateral to the primary object of the scheme. The second phase of the conspiracy dates from the enlistment of Davidson and his active efforts to reach an agreement with Davis. Davidson employed the same innuendos and held forth the same promise of special benefits as inducement to Davis. Davidson's efforts were directed at attaining the same ultimate objective as that of the other appellants—a substantial payment from Davis— and used the same techniques to obtain it. Davidson is thus shown to have participated in a conspiracy. Other evidence sustains the view that it was *the* conspiracy charged in the indictment. In attempting to secure Davis' agreement, Davidson posed as a close friend of Carrigan's and maintained that a deal was possible through Carrigan's intercession. He at all times appeared to be acting as an intermediary between Carrigan and Davis; he demanded an additional payment of $500 for Carrigan and made disclosures concerning the workings of Carrigan's office and plans, knowledge of which could have been obtained only through close contact with Carrigan. Thus, Davidson first informed Davis of the decision to send him to Santa Rita instead of the prison initially agreed upon, Fairfield. Davidson knew in advance when Davis would be required to surrender and made the arrangements for Davis' surrender into custody. Corroborating Davidson's close contact with the marshal's office, Calmes appeared at the agreed time and place to accept Davis' surrender, yet Davis had had no communication from the marshal's office concerning his surrender. It was Davidson who first informed Davis of Carrigan's threat to move Davis to McNeil Island unless a payment was made and later Carrigan ordered Davis prepared for just such a transfer. The inference of pre-arrangement and tie-in between Davidson and Carrigan and Calmes was inescapable. Davidson's subsequent withdrawal from the conspiracy, if such it was, would not affect his criminal liability for participation in the conspiracy. The sub-

sequent conduct of Carrigan and Calmes in attempting to secure the $2000 payment from Davis emphasizes the continuing nature of the conspiracy initially created by those two. Unlike the Kotteakos case, the inter-relationships between the individual appellants has been sufficiently shown to warrant the jury in finding the existence of a single overall plan in which all participated.

■ We append the instructions given by the trial court,[1] to portions of which

4. "The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, you would be justified in the conclusion that such persons were engaged in a conspiracy. Nor is it necessary to prove that the conspiracy originated with all of the defendants, or that they all met during the process of its concoction; for every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the other parties before or afterward, in furtherance of the common design. Although, as I have stated, a common design is the essence of the charge, such design may be made to appear when the defendants steadily pursue the same object, whether acting separately or together by common or different means, all leading to the same unlawful result.

"If the evidence of the separate details of the transaction as it was carried out indicates with the requisite certainty the existence of a preconceived plan and purpose, that is sufficient to permit you to infer that the illegal agreement charged was in fact entered into.

"If, after considering all the facts and circumstances in this case relative to the indictment, any one of the material facts relied upon by prosecution to establish the guilt of any defendant has not been established to a moral certainty and beyond a reasonable doubt, then you must return a verdict herein finding that defendant not guilty even though you should also find that other facts in the case have been established.

"In order to warrant you in finding a verdict of guilty against the defendants, or any of them, it is necessary that you be satisfied beyond a reasonable doubt that a conspiracy as charged in the indictment was entered into between two or more of the defendants to violate the law of the United States in the manner described in the indictment. It is necessary further that in addition to the showing of the unlawful conspiracy or agreement, the Government prove to your satisfaction, beyond a reasonable doubt, that one or more of the overt acts described in the indictment was done by one or more of the defendants or at their direction or with their aid, and that such overt act or acts was in furtherance of the object of the conspiracy.

"Under the charge made the conspiracy constitutes the offense and it must be made to appear from the evidence, beyond a reasonable doubt, before any defendant can be convicted, that such defendant was a party to the conspiracy and unlawful agreement charged, and that he continued to be such up to the time that overt acts were committed, if the evidence shows that there were any such. The mere fact that either or any of the acts charged in the indictment as overt acts were committed, would not authorize a conviction by reason of that fact alone, but it is necessary to show that such defendant or defendants were parties to the conspiracy and unlawful agreement before their guilt of the offense charged is made out.

"Each party to the conspiracy must be actuated by a specific intent to promote the common design. If persons pursue by their acts the same unlawful object, one performing one act, and a second another act, all with a view to the attainment of the object they are pursuing, the conclusion is warranted that they are engaged in a conspiracy to effect that object. Co-operation in some form must be shown. There must be intentional participation in the transaction with a view and purpose to further the common design. And if a person, understanding the unlawful character of a transaction, encourages, advises, or in any manner, with a purpose to forward the enterprise or scheme, assists in its prosecution, he becomes a conspirator. And so a new party, coming into a conspiracy after its inception, with knowledge of its purpose and object, and with intent to promote the same, becomes a

complaint is made. We think a reading of the instructions at once demonstrates that they correctly state the law.

Judgment affirmed.

party to all of the acts done before his introduction into the unlawful combination, as well as to the acts done afterwards. Joint assent and joint participation in the conspiracy may be found, like any other fact, as an inference from facts proved.

"The evidence in proof of the conspiracy may be circumstantial. Where circumstantial evidence is relied upon to establish the conspiracy or any other essential fact, it is not only necessary that all the circumstances concur to show the existence of the conspiracy or fact sought to be proved, but such circumstantial evidence must be inconsistent with any other rational conclusion. That is, you are to consider all of the circumstances and conditions shown in evidence, and if it appears to you as reasonable persons that, even though there is no direct evidence of the actual participation in the alleged offense by the defendants, or any of them, a reasonable inference from all of the facts and circumstances does to your minds, beyond a reasonable doubt, show that the defendants were parties to the conspiracy as charged, then you should make the deduction and find accordingly.

"An indictment charging a specified crime cannot be supported or proved by proof of a different crime. If you find that two or more of the defendants entered into some conspiracy somewhere at some time but that they did not enter into the conspiracy charged in the indictment then you must acquit them of the conspiracy charged in the indictment."