GENERAL ACCIDENT, FIRE and LIFE ASSURANCE CORP., Limited, a Corporation, Appellant,

v.

INDEPENDENT MILITARY AIR TRANSPORT ASSOCIATION, a Corporation, Appellee.

No. 14847.

United States Court of Appeals Ninth Circuit.

April 19, 1956.

Thomas E. Davis, San Francisco, Cal., for appellant.

Richard Ernst, R. L. Miller, Richard G. Logan, San Francisco, Cal., for appellee.

Before POPE and CHAMBERS, Circuit Judges, and MATHES, District Judge.

MATHES, District Judge.

The insurer appeals from an adverse judgment imposing liability for appellee's claim of loss under a policy of fidelity insurance.

Jurisdiction of the District Court was invoked upon the ground of diversity of citizenship [28 U.S.C. § 1332], and trial by jury was waived. The substantive law of California governs. Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 108–109, 65 S.Ct. 1464, 89 L.Ed. 2079.

The claimed loss is alleged to have resulted from the rifling of appellee's cash box by a person or persons unknown.

The insuring clauses of the policy include provision that: "If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Assured shall be unable

to designate the specific Employee or Employees causing such loss, the Assured shall nevertheless have the benefit of this Insuring Agreement, provided that the evidence submitted reasonably * * * establishes that the loss was in fact due to the fraud or dishonesty of one or more of said Employees * * *."

Appellant denied appellee's claim under the quoted insuring clause and, following trial of the issue, the District Court found that "the evidence adduced reasonably establishes that [the loss] was due to the dishonesty of one or more * * * employees, rather than to the act of a stranger."

The single ground asserted for reversal rests upon the contention that appellee failed to sustain "the burden * * to prove by a preponderance of the evidence that an employee * * * was guilty of theft."

This failure of proof is said to result from the fact that "each employee who was in any way connected with the moneys * * * testified unequivocally that he or she was not guilty of any dishonesty", and "that testimony is fortified by the strongest of all rebuttable presumptions, namely, that a person is innocent of crime * * *."

Appellant concedes, however, that "circumstantial evidence may outweigh the strongest of disputable presumptions * * * and direct evidence as well." See Scott v. Burke, 1952, 39 Cal.2d 388, 398, 247 P.2d 313, 319.

Appellee's loss being admitted, the sole question remaining for determination by the District Judge as trier of fact was whether one or more employees, rather than one or more strangers or outsiders, took the money.

■ Even if it could properly be assumed that the presumption of innocence is of probative force to be weighed in favor of a finding that none of the employees are guilty of the crime, the weight of it is exactly cancelled by the universal availability of the presumption to outsiders as well. See: Holt v. United States, 1910, 218 U.S. 245, 253, 31 S.

Ct. 2, 54 L.Ed. 1021; Agnew v. United States, 1897, 165 U.S. 36, 49–50, 52, 17 S.Ct. 235, 41 L.Ed. 624; Coffin v. United States, 1895, 156 U.S. 432, 455–460, 15 S.Ct. 394, 39 L.Ed. 481; United States v. Nimerick, 2 Cir., 118 F.2d 464, 467–468, 152 A.L.R. 620, certiorari denied 1941, 313 U.S. 592, 61 S.Ct. 1117, 85 L. Ed. 1546.

Thus the specific question becomes: whether the trial judge was clearly wrong in finding that the circumstantial evidence pointing to one or more of the employees outweighed the direct-evidence denials made by those employees who had ready access to the money. Fed. Rules Civ.Proc. rule 52(a), 28 U.S.C.A.

It is uncontradicted that the money in question, some $15,000 in currency, was taken from a locked cash box, from a drawer of a locked desk, from the office of appellee's manager at Oakland Airport.

It is likewise uncontradicted that neither doors nor windows of the building, or of the manager's office, nor the desk, nor the cash box, disclosed any evidence of forcible entry.

However, the manager's secretary testified that after the loss occurred her father-in-law demonstrated to her that he was able to open the outer door of the building without a key; also that after the loss she learned for the first time that the manager's desk drawer could be opened without a key. And the manager testified that "after the robbery" he learned for the first time that there were "other keys" reposing in an unlocked drawer of a spare desk in appellee's outer office, which would fit the cash box in question.

In the light of this testimony, it may simplify consideration if we view the case as if it were conceded that on the night of the loss both outsiders and employees had equal access to the missing currency.

As the name indicates, appellee is engaged in the business of transporting passengers by air. Among other places,

appellee maintains an office in a small building at Oakland Airport.

The evidence discloses that during the period material here this office consisted of a single room with a dividing partition separating the front or outer office from the rear or manager's office. A door fronting on the airport street opens into the front office; there is a connecting door through the partition into the manager's office; and a rear door opening from the manager's office into a hangar.

The partition dividing the two offices, and the outer walls of the building as well, are of opaque construction from the floor up to less than waist height, and of translucent glass on up to the ceiling or roof. It was the practice to leave the inside lights on throughout the night, and this was done on the Friday night in question.

Across the street is a 24-hour service station of a large oil company, always brightly lighted at night. It is undisputed that after dark the silhouetted movements of any person inside appellee's premises, including the manager's office to the rear, could readily be seen from the street.

The employees working out of appellee's office at Oakland Airport consisted of: (1) the manager, who was responsible for the safekeeping of the money; (2) the manager's secretary, who had worked with him for some years before employed by appellee; (3) the manager's brother-in-law, who was in charge of "meeting incoming aircraft and loading outbound aircraft"; (4) a man in charge of selling tickets; and (5) the latter's brother, who worked only part time.

In 1953, on Wednesday, the day before Thanksgiving, appellee had sold an unusually large number of tickets to mem bers of the Marine Corps on holiday leave. The total received was in excess of $15,000 in currency. At the close of Wednesday's business, the employee in charge of ticket sales delivered the cash box containing the money to the manager in the presence of his secretary. The next day, Thursday, was Thanksgiving Day, and of course a bank holiday.

So unaccustomed was the Oakland office to handle such a large sum of money that early Wednesday evening the manager telephoned appellee's comptroller at the latter's home across the Continent in Arlington, Virginia, and inquired for instructions as to handling. According to the uncontradicted testimony of the comptroller, he and the manager "discussed considerable alternate possibilities and * * * I instructed him to take the money to Western Union and purchase a Western Union money order for it, and have it sent to himself in order that he might complete his cash report at his leisure."

The secretary took the money to the airport Western Union office but, upon learning that the cost of "wiring" the money would be "in the neighborhood of $50", concluded to recommend to the manager that the comptroller's instructions be not followed.

The secretary thereupon took the money to the manager, who had meantime gone into a nearby cocktail lounge. There the manager decided to follow his secretary's recommendation rather than the comptroller's instructions, and it was arranged to place the money in the safe of the "Transocean Restaurant and Bar," and take a receipt for it.

There the money remained until Friday morning, November 27th, when appellee's manager retrieved it from Transocean's safe and took it back to his office.

Although the manager's secretary admittedly had on previous occasions deposited lesser sums to appellee's credit in a bank in neighboring Alameda, there is no evidence of any suggestion that any part of the $15,000 be so deposited on Friday, although the banks remained open throughout that day until six o'clock in the evening.

Late Friday afternoon the manager and the man in charge of ticket sales decided to spread the currency out on

the floor of the manager's office and count it. Meanwhile the secretary, who had been working on the cash report, left for the day around seven o'clock Friday evening, while the manager and the ticket seller were "still in the process of counting money."

Later Friday evening, after they had finished the count and had placed the money in the cash box and had locked the box, the manager and the ticket seller entered upon a discussion as to where they should place the cash box for safe keeping until the morrow. As to this the ticket seller testified:

"Q. And do you recall what the substance of that conversation was, what he said and what you said? A. Well, I can generally, yes. The safe at Transocean was discussed again. * * * I suggested the safe in the gas station which is right across the street.

* * * * * *

"Q. What other suggestions did you make? A. Transocean, Transocean safe.

"Q. Yes. And did * * * [the manager] make any comments or suggestions as to handling of the money?

* * * * * *

"A. He suggested that he could take it home with him, that he had a rather vicious dog at home, quite sure nobody would get near the house.

"Q. What was finally done with the cash box? A. It was placed in the middle right-hand drawer [of the manager's desk] and the drawer was locked."

Further testimony of the ticket seller reveals that the manager presumably had the only available key to the desk, while the ticket seller presumably had the only available key to the cash box.

The manager testified that after leaving Friday night in company with the ticket seller, he returned to his office, telephoned appellee's Washington office about some routine matter, then tele-phoned his wife and left, arriving home before ten. The next morning, Saturday, he went to his office as usual.

The manager's brother-in-law testified that at noon on Friday the manager "let me have the rest of the day off, told me to come back Saturday around noon."

The ticket seller continues:

"Q. Now, when did you next go back to that office? A. The following morning about 11:30.

"Q. That was Saturday morning, the 28th? A. Yes, sir.

"Q. Where did you live at that time? A. In Berkeley. * * *

"Q. Had you plans, when you left on Friday night, had you planned to return to work on Saturday morning? A. I don't think so. I don't think I had. I couldn't answer that.

"Q. Do you recall why you went over on Saturday morning? A. Yes; because * * * [the secretary] called me about 10:30 and told me to pick her up and take her to the bank.

* * * * * *

"Q. Now, will you tell us what happened after you got there at 11:30 that morning, as near as you can recall? A. Well, as near as I can recall, they were working on the cash report.

"Q. When you say 'they' were, who do you mean? A. Well, * * * [the secretary] and I can't remember whether * * * [the manager] was at the time or not. * * *

"Q. And this was, oh, about 11:30? A. Quarter of twelve. And at 12:30, or approximately 12:30 it was decided to count the cash again, and * * * [the manager] gave me the key to his desk and * * * [his brother-in-law] at the time was working at * * * [the manager's] desk, or he was in the back office, and I remember I had trouble with * * * [the manager's] key. Then * * *

[the brother-in-law] helped me. You have to open the center drawer before you can pull out the side drawers.

\* \* \* \* \* \*

"Q. Was the cash box locked when you took it out of the desk? A. Yes, it was.

"Q. And you unlocked it? A. Yes.

\* \* \* \* \* \*

"Q. What was missing? A. The currency. \* \* \*

"Q. Well, was there anything left in the box? A. Coin and checks, postal money orders, checks. \* \* \*

"Q. When you discovered that, I understand \* \* \* [the secretary] was in the room, \* \* \* [the manager] was in the room, and \* \* \* [the manager's brother-in-law] was in the room? A. Yes, sir.

"Q. What did you say when you saw this money missing? A. I can't remember \* \* \* I know I said something; it was something pertaining to \* \* \* [the manager]. I thought he had taken it home with him, you see.

"Q. And you recall \* \* \* [the manager] saying anything? A. Well, not now. He said something \* \* \* 'You're joking, you're kidding,' or something along those lines."

As to the highlights of that Saturday morning, the secretary testified:

"Q. And what was the reason for calling him [the ticket seller]? A. I wanted an escort to the bank.

"Q. You knew he lived in Berkeley, didn't you? A. Yes, sir.

"Q. That is a considerable distance from the Oakland Airport? A. Right.

\* \* \* \* \* \*

"Q. While you and \* \* \* [the manager] were in that office Saturday morning, did \* \* \*

[he] ask you to go and see if the cash box was in his desk? A. Yes, sir; he did \* \* \*. [The manager] handed me the keys to his desk, said, \* \* \* 'will you please check and see if the cash box is still in the desk.' I went to the desk, looked at the box, locked it and returned the keys.

"Q. You didn't take that cash box out of the desk? A. No, sir.

\* \* \* \* \* \*

"Q. \* \* \* And where was the cash box opened up? A. As I recall, there was some difficulty in opening the desk at the time, so \* \* \* [the manager's brother-in-law] went over to \* \* \* [the ticket seller] and helped him open the desk. Then they both brought the cash box into the front office and \* \* \* [the ticket seller] had the key to the cash box, so he opened it.

"Q. Now do you remember, can you remember if he said anything when he opened that cash box and looked in it? A. Yes, sir, I can.

"Q. What did he say? A. 'All right \* \* \* where is the money?'

\* \* \* \* \* \*

"Q. Do you recall if \* \* \* [the manager] said anything in respect to this statement of \* \* \* [the ticket seller]? A. \* \* \* He had just turned absolutely gray. He said, 'It should be in there.' And then—No, wait a minute. I can recall he said, 'You are kidding.' And \* \* \* [the manager] just turned gray."

Against the uncontradicted direct evidence given by the employees there stands only an inference—a deduction or conclusion which reason and common sense lead the trier to draw from facts which have been proved.

After hearing the witnesses, viewing their demeanor and manner, the able and experienced trial judge drew the inference which led him to find: "the evidence adduced reasonably establishes that [the loss] was due to the dishonesty

of one or more * .* * employees * * *."

As stated at the outset, we have considered the case as if both outsiders and employees had equal access to the missing currency on the night of the loss. That assumption refers of course to physical accessibility, and not to knowledge.

While the fact that appellee did an abnormally large cash business on Wednesday may have been known to outsiders, only the employees presumably had knowledge that the proceeds were not banked in the normal course of business on Friday, but were kept in the office in defiance of the comptroller's instructions, to be spread out on the floor and counted again, and then left for the night in the manager's desk drawer. With banks closed for the week-end at 6 o'clock on Friday, it is reasonable to infer that a stranger would hardly expect to find a full cash box in a drawer of the manager's desk on Friday night or Saturday morning.

Rule 52 directs that: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.Proc., rule 52(a), 28 U.S.C.A.

Accordingly it is settled that a finding will not be held "clearly erroneous" unless " 'the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' " United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

A careful review of the entire record at bar leaves us with the conviction that the challenged finding of the learned District Judge was far from clearly wrong.

The judgment is affirmed.