(No. 12957.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RALPH BAKER, Plaintiff in Error.

*Opinion filed December 17, 1919.*

1. CRIMINAL LAW—*limitation on the rule that opposite party may prove all of conversation referred to.* The general rule that when a part of a conversation is called out by one party in cross-examining a witness the other party has the right to all of such conversation is subject to the limitation that the questions, on re-examination, must be connected with the statements elicited upon cross-examination.

2. SAME—*testimony in rebuttal must contradict or explain what has been received.* In rebuttal a party can introduce no testimony which has not a direct tendency to contradict or explain that which has been received.

3. SAME—*when defense may object to evidence of conversation although referred to on cross-examination.* Where a witness for the People in a murder trial has testified that he watched the defendant's actions on the night of the killing, the defense may ask, on cross-examination, if anything was said to cause the witness to notice the defendant, and the fact that the witness answers, "Well, yes," does not give the People the right, over objection, to prove what was said, there being no claim that the defendant was present.

4. SAME—*an instruction should be based upon the evidence.* An instruction stating an assumed state of facts not based upon the evidence or any theory properly deducible from the evidence should not be given.

WRIT OF ERROR to the Circuit Court of Williamson county; the Hon. B. W. POPE, Judge, presiding.

NEELY, GALLIMORE & COOK, and CHARLES DURFEE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, R. R. FOWLER, State's Attorney, and FLOYD E. BRITTON, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error was convicted of manslaughter March 21, 1919, in the circuit court of Williamson county, on an indictment charging him with the murder of Mayo Wil-

liams, and was thereafter sentenced by the court to serve an indefinite term in the Southern Illinois Penitentiary at Chester, after overruling motions for a new trial and in arrest of judgment.

Baker was twenty-three years old and lived in Pope county on a farm until about three years before the killing, and for three years has lived in Herrin and vicinity, where he was engaged in driving a delivery wagon and in teaming. The deceased, Williams, was a coal miner and had moved from Kentucky to Herrin in March, 1918, and lived in a house of six rooms and two pantries as tenant of J. W. Randolph, father-in-law of Baker. Randolph, who then lived in Pope county, in August, 1918, informed Williams that he wanted possession of his house. Williams replied that he could not move until he could get another house. Randolph intended to live in the house with his family and Baker and his wife were to live with them. Some time in August, Baker, by agreement with Williams, moved into and occupied the four front rooms of the house with his wife and Randolph's two daughters, Bessie and Blanche, aged fourteen and twelve years, respectively, and who were there for the purpose of attending school. As agent of Randolph, Baker gave Williams a thirty-day notice to vacate. Williams told him that he would not vacate until he got another house. Baker replied that that was all right and that he would help him look for a house. Baker found one for him about two miles away, but it did not suit Williams and he still refused to move. Baker gave him a second notice to vacate, and on October 12, 1918, obtained for Randolph a judgment for possession in a forcible entry and detainer suit. On the evening of the killing, October 15, 1918, Baker got home from teaming about six o'clock. Williams had already gotten home from the mines at which he worked, and after his supper, at about 4:30 o'clock, had gone up to the business portion of Herrin to pay some bills. After his supper, about seven o'clock,

Baker also went to town to get some medicine and to meet his brother-in-law, and went to a second drug store before he found the medicine that he wanted. He then went to another place from that drug store to meet his brother-in-law and from there home, which he reached about 7:30 or 8:00 o'clock, at which place the killing occurred, on a bright moonlight night. The house faces the west on Eleventh street and is about sixteen feet from the street. Mrs. Baker and the two Randolph girls occupied the northwest corner room as a bed-room, which has a window on the north side and one on the west side. Mrs. Williams occupied a room just east of this room on the north side of the house as a bed-room, which has a window in the north side, and one of the pantries was just east of this room and adjoining it and was in the northeast corner of the house. Just south of Mrs. Williams' bed-room and the pantry was her dining room and kitchen, and her bed-room and the pantry opened into the dining room and kitchen. The house is considerably higher off the ground on the east side than on the west side, and it was also entered on the east by Williams by ascending about nine steps, at the top of which is the east door, and there is a small entryway connecting this door with Mrs. Williams' dining room and kitchen. Her dining room and kitchen also are connected by a door with Baker's dining room.

Only four witnesses testified as to the difficulty between Baker and Williams and the killing,—Baker, the two Randolph girls and Mrs. Williams, wife of deceased. Baker's testimony is, in substance, as follows: On his way home he saw Williams ahead of him and on the opposite side of the street from him. He slowed up to a very slow walk to avoid overtaking him and reached his home a few minutes after Williams had arrived. Just as he was about to enter his west front door, Williams, standing a little north and about eight feet west of the northwest corner of the house, asked him to come over,—that he (Williams) wanted

to settle with him. Baker walked over to him and said that he was willing to settle any way that was honorable and fair. Williams called him a red-headed son of a b——, and immediately struck at him with a club about thirty-five inches long. Baker made an effort to get hold of the club, jumping toward Williams and back of him. Williams continued to strike at him while Baker backed east away from him several feet and to near the northeast corner of the house, when, to keep Williams from striking him, he fired one shot at him from his revolver. Williams was apparently striking his best with both hands, and when Baker jumped for the club Williams told him that if he touched it he would fill him with hot lead. Baker, before he fired, asked him a number of times to lay down his club and fight fair, but Williams refused to do so. The ball struck Williams in the front part of the abdomen. No one was on the steps on the east side of the house when the shot was fired. After Williams was shot he went up the steps into the house, and as he went up Baker's wife and the two Randolph girls were on the steps. Baker did not see Mrs. Williams on the steps. He also positively contradicted Mrs. Williams in every particular in her testimony as to what Baker, Williams and herself said just prior to the shot, and as to what Baker did to Williams and Williams to Baker, except in so far as her testimony harmonizes with his evidence. By saying he wanted to settle, Baker testified that he thought Williams wanted to settle the matter about the house; that he could not retreat to the north when Williams was striking at him, on account of the fence there, and that he was pressed so close that he had to shoot to prevent Williams from striking him; that he purchased the revolver that he shot Williams with in Herrin on October 12, after the trial about the possession of the house, because Williams told him on that day that if he put him out of the house he would kill him and because he thought Williams would kill him; that he went the regular way up-town that night

to the first drug store he visited and from there to the other drug store and from the second drug store to meet his brother-in-law; that he saw Williams coming out of a store as he passed the Herrin Supply corner, but did not know which way he went and did not follow him.

The substance of Mrs. Williams' testimony relating to the difficulty is as follows: After her husband and Baker went up-town that evening she next saw her husband as he passed her north bed-room window. Baker and her husband were right together, Baker having hold of his arm. Williams was doing nothing but walking fast toward the east door. She heard Williams say, "Let me alone, Baker; I want to go in; my wife and children are in there and I am going to them." Baker said, "You are not going in the house to-night; damn son of a b——, you will not go." She then said to Baker, "Let him alone; let him come in." Baker replied, "I won't; I am going to kill the damn son of a b——." Then Williams jumped one step back towards the steps and Baker shot him in the abdomen. Williams fell but rose again and walked up the steps and into the house and dropped into a chair and said, "Mamma, he has killed me." Baker went around the house towards his room. Williams remained at the house about thirty minutes after the shooting and was then carried to the Herrin Hospital. Williams did not do anything at the time he was shot except try to go into the house and was not armed. He died November 3, 1918. She further testified that she did not see Mrs. Baker until after the shooting, and that she did not see any of the Baker family after the parties to the difficulty left the house to go up-town; that she could not say whether the two Randolph girls were there or not; that she did not see them at the top of the steps before the shooting or immediately after; that she herself did not say, immediately after the shooting, "Now, Mayo, I told you that you would kill him, and you have done it;" that she knew at the time the shot was fired who fired it; that at

that time she was standing on the steps at the east side of the house,—the second step from the top; that Baker was standing right against her husband and was holding him at the time he shot him; that he had him by the arm, and her husband jerked loose and Baker fired just one shot; that she did not hear any talking in front of the house that night, and that the first thing she heard was, "Let me alone, Baker; I want to go in."

The two Randolph sisters corroborated Baker in his details of the difficulty up to the time the parties passed the north window, going east, and testified that they heard the shooting but did not see it; that immediately after the shooting they and Mrs. Baker ran out through their dining room and through the kitchen and dining room of Mrs. Williams and into the hallway at the top of the steps, with Mrs. Baker in front; that Mrs. Williams was still in her bed-room or in her dining room and kitchen and did not go onto the steps or into the hallway. They further testified that they heard the conversation between Baker and Williams in the front yard up to the shooting, and they contradict Mrs. Williams in her testimony as to what Williams and Baker said to each other just before the shooting. They also testified that Mrs. Williams, while in her bed-room just before the shooting, said to her husband, "Come in the house and leave him alone," and after the shooting, "Now, Mayo, I told you that you would kill him, and you have done it." According to their testimony they and Mrs. Baker had all gone to bed in the northwest room before Williams and Baker had returned from up-town. They got up to see a passing automobile containing several men who were making considerable noise and who they thought were going to stop at their house. While looking through the west window of their room they discovered Williams standing by a tree in the yard about eight feet west and a little north of the northwest corner of the house, and that in about five minutes Baker came home, and then

the conversations and difficulty between the parties were begun and ended as already stated.

Baker proved a good reputation as a peaceable and law-abiding citizen by ten witnesses, about an equal number of whom lived in Herrin and the others in Pope county, the court limiting such witnesses to that number, this evidence being uncontradicted. The club that Williams used in the difficulty, as testified by defendant's witnesses, was produced at the trial and appears to be a very formidable club, and was described as being about two inches wide and one inch thick at the larger end. Baker gave himself up to the officers after the shooting, and at his request he and the officers returned to the house to look for this club but did not find it. According to the testimony of the Randolph sisters the club was found next morning in Mrs. Williams' pantry. Other witnesses for the People, who claim they had been there, testified that this club was not there that night or the next morning. Another witness for the People testified that after surrendering, and in the presence of an officer, Baker made the remark that he would not have given a damn for shooting Williams if it wasn't for his (Baker's) wife. The officer positively contradicted him and testified that Baker said he hated that he had to do it, on account of the children. Another witness for the defense testified that said witness for the People told him before the trial that he did not know anything about the case at all. Two coal miners, one of them a brother-in-law of Williams, testified for the defense that they had known him for a number of years, and that on Sunday before he was killed he came to them to borrow a revolver, saying to one of them, "Baker has threatened me and has sued me for possession and was granted it yesterday." One of them said to him, "You look like you need a gun; you have got a wife and four children; better stay out of trouble." He got no gun from either of them.

From the foregoing testimony it clearly appears that according to the testimony of Mrs. Williams Baker is guilty of murder. According to the testimony of Baker and the Randolph sisters he killed Williams in self-defense. The jury found him guilty of manslaughter. It would not be proper to further discuss the merits of the case, as the judgment of the court will have to be reversed for errors in the record.

Two coal miners, who were friends of the deceased, refused, on request of plaintiff in error's attorneys at the time the case was being tried, to tell them anything as to what their testimony would be until they took the witness stand, although they admitted that they were witnesses. They testified that they had never known Baker until the night of the killing and that he was pointed out to them that night. The substance of their other testimony is that on that evening they saw Baker up-town, watching Williams. One of them testified that all the movements Williams made Baker was watching him, either from a corner or from the opposite side of the street. Speaking of Baker one of them testified: "Baker looked at us; he kept his eyes on Williams until he got down north one-half of a block; after we passed Baker I noticed that he continued to eye Williams." Counsel for the defense then asked this question on cross-examination: "How did you come to notice Baker, if you did? Was anything said to you to cause you to do that?" and witness answered, "Well, yes." No further question was asked by the defense. On re-direct examination, over the objection of defendant's counsel, the witness was permitted by the court, on questions propounded to him by the State, to answer what was said to him, and who said it, that caused him to notice Baker. The witness' answer was as follows: "Williams pointed Baker out to me and said Baker had been abusing him and following him around, and that he expected Baker to jump on him." There was nothing further of importance in these witnesses' testimony,

except that one of them testified that Williams weighed about 135 pounds and was crippled in the neck and shoulder, while it further appeared from other evidence that Baker weighed 178 pounds. Neither of these witnesses testified that Baker or Williams spoke to one another that night or that Baker made any demonstrations toward Williams. Williams was in the most crowded portion of the town, which one of them testified contained 15,000 inhabitants. Neither of them testified that Baker followed Williams when Williams started home, and Williams' statements to the witness were not in the presence of Baker. This hearsay evidence, no doubt, had very great influence with the jury. It went to the jury as testimony coming from the deceased that Baker was the aggressor in the controversy and in the difficulty in question. It was specifically objected to as hearsay testimony and improper. The court admitted it upon the ground that counsel for the defense rendered it admissible by asking the witness if there was anything to cause him to notice Baker and how he came to notice him.

It is a general rule in the trial of cases, civil and criminal, that when a part of a conversation is called out by one party the other party has the right to all of such conversation. There are several limitations to this rule. One is that if the questions, on re-examination, are not connected with the statements elicited on cross-examination or are remote and distinct from those inquiries, they should be excluded. It is also an unvarying rule that the parties seeking to rebut can introduce no testimony which has not a direct tendency to contradict or explain that which has been received. It has also been well ruled that when a witness in his testimony on cross-examination refers to a conversation that he had with another party, not shown to be relevant to the case on trial, for the purpose of fixing the time he first had knowledge of the facts to which he was testifying, the opposite party is not entitled, on re-examination, to have the full details of that conversation, if objection is

made. (5 Jones on Evidence, sec. 873; *Uhe* v. *Chicago, Milwaukee and St. Paul Railway Co.* 3 S. Dak. 563.) Defendant's counsel in this case did not ask for any part of a conversation had by the witness. No part of the conversation was detailed or given by the witness on cross-examination. Counsel for the defense at no time attempted to show that there was nothing said that drew witness' attention to Baker. He was admittedly unacquainted with Baker. The defendant had a right to know if the witness had any cause for watching the defendant,—a stranger to him,—without forfeiting his right to object to incompetent and prejudicial hearsay evidence against him. The conversation drawn out on re-examination does not rebut or contradict the testimony of the witness or any inference sought to be drawn out by the inquiry of defendant's counsel. The State was therefore not entitled to have the hearsay testimony related, and we must hold that the trial judge committed reversible error in admitting it. That hearsay evidence or the unsworn declarations of a party are not admissible in evidence against another is a general rule well established.

There was also error committed in giving the State's instruction No. 21, which contained as a part thereof this language: "And if you believe from the evidence in this case, beyond a reasonable doubt, that the deceased was endeavoring to enter the house where his family resided, and that the defendant, for the purpose of keeping him from entering the house, attempted to use force to prevent him from entering the house, then the deceased would have had a right to pick up a stick," etc. The issues in this case were clear. All the defendant's witnesses who saw the difficulty stated that Williams had this club in his hand when Baker was first accosted by him and that he continued to strike at Baker with it until the shot was fired. The evidence for the State is, in substance, that he never did at any time have or pick up a stick during the conflict. This instruction is therefore not based upon the evidence

or on any theory deducible from the evidence, and was for that reason erroneous.

It is also urged that the court erred in giving instructions Nos. 5 and 8 for the People, because they were mere abstract propositions of law. No. 5 amounts to no more than a definition of malice, accompanied by the further statement that malice is implied from any deliberate or cruel act against another, however sudden, which shows an abandoned and malignant heart. No. 8 is to the effect that malice is not required to be present in the mind of the accused for any considerable time, but that it is sufficient if it was present and that the alleged killing was perpetrated under its influence. These instructions are the usual instructions given in such cases. The accompanying statement to No. 5 is the only part of it that could possibly be prejudicial. There is no ground for complaint in the giving of instruction No. 8. Taking the instructions as a whole, we do not think that defendant was prejudiced by the giving of instruction No. 5.

Complaint is made that certain remarks made by counsel for the State were improper and prejudicial to the defendant. The court sustained objections to all the remarks of counsel that were improper, the most serious of which was the remark of the State's counsel that one of the defendant's counsel must have been born in the objective case, because he was making several objections to the remarks of counsel to the jury in his argument. We do not think that under the rulings of the court in this regard defendant's counsel was prejudiced. The objectionable remarks, however, ought not to be repeated on another trial.

For the errors indicated the judgment of the court is reversed and the cause remanded for further proceedings.

*Reversed and remanded.*