**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Salvatore APUZZO, Defendant-Appellant.
Nos. 132, 133, Dockets 24019, 24020.**

United States Court of Appeals
Second Circuit.

Argued Nov. 14, 1956.

Decided May 28, 1957.

Arnold D. Roseman, New York City
(George M. Lehr, New York City, on
the brief), for defendant-appellant.

Maurice N. Nessen, Asst. U. S. Atty.,
S.D.N.Y., New York City (Paul W. Williams, U. S. Atty., and George S. Leisure,
Jr., Asst. U. S. Atty., New York City,
on the brief), for plaintiff-appellee.

Before CLARK, Chief Judge, and
FRANK,[1] MEDINA, HINCKS, and
WATERMAN, Circuit Judges.

CLARK, Chief Judge.

This appeal involves a criminal prosecution presenting generally routine matters, leading to a clearly justified conviction and an appropriate, if light, sentence for this defendant. A single issue, as to testimony about the defendant's arrest fifteen years earlier, presented challenge; and because of its potential importance in the administration of the criminal law after the initial hearing before a panel of Judge FRANK, Judge WATERMAN, and myself, the court ordered another hearing before the full bench.[2] This second hearing on oral argument and further briefs resulted in a majority vote for affirmance.

Salvatore Apuzzo, the defendant, was prosecuted under two informations: one information alleged that he and two codefendants, Samuel Aaron and Ernest Broussard, were engaged during the month of August 1953 in the business of accepting wagers individually and as a copartnership, and that they willfully failed to register and pay the special occupation tax on gamblers in violation of 26 U.S.C. §§ 2707(b), 3277, 3290, 3291 (a), 3292, and 3294. The other information charged the three men with a conspiracy, during the period July 28 to August 5, 1953, to commit those crimes in violation of the general conspiracy stat-

1. Judge Frank heard the argument of this case on the original hearing and on the rehearing *en banc* and voted to reverse and remand, preparing supporting memoranda to that effect. He died, however, before this opinion was written.

2. Except for Judge Lumbard, who disqualified himself, since he was United States Attorney during the prosecution.

ute, 18 U.S.C. § 371. Aaron and Broussard pleaded guilty to the second information, and only Apuzzo stood trial. The jury found him guilty on both informations. He was sentenced on the first information to a $3,000 fine and 60 days' imprisonment, followed by 4 years' probation; on the second information, sentence was suspended and a 4-year probation period imposed, to run concurrently with that on the first information. He appeals from this judgment of conviction.

It is undisputed that the defendant is the proprietor of a small butcher shop at 363 Lenox Avenue, New York City, and has been in the butcher business for 15 or 20 years. His brother-in-law, Isidori, who had been in his employ as a butcher for 6 years, testified that normally the defendant opened the safe in the store early each morning before going to the market to buy meat. Defendant and Isidori, the same witness stated, worked at the store every evening between 5 and 8 o'clock. Codefendants Aaron and Broussard were employees of the defendant who worked behind the counter of the store at the times in issue here.

From July 28 to August 5, 1953, two federal agents made five visits to the butcher shop between 12:30 and 1:30 in the afternoon, and placed "policy" bets with Aaron and Broussard, who were behind the counter. The two agents testified, without contradiction, that during these visits they saw people lined up in front of the counter placing bets, and that on an occasion when one agent asked Aaron what number had won the day before Aaron pointed to three numerals which were posted on the front of the scales. Prior to their visit on August 5, 1953, both agents prepared carbon copies of policy slips; and upon entering the butcher shop they made bets with the originals and kept the carbon copies for evidence. During this whole period Aaron and Broussard, in addition to accepting bets, were also engaged in selling meat; and the defendant was never seen in the store by the two agents.

Later in the afternoon of August 5, 1953, pursuant to a valid search warrant, four agents raided the shop, proceeding through the main part of the store to a small room in the rear. All four agents testified, without substantial contradiction and quite unshaken after extensive cross-examination. They established that they found the defendant with two bystanders in the back room inspecting ties which an itinerant tie merchant was trying to sell. As the agents entered the room they wore their badges and announced their identity as federal men. One or more of them had drawn guns. Each agent questioned a different person found in the room, and Agent Lemler was apparently the first to question Apuzzo. Apuzzo at first maintained that he was only a visitor to the store and then claimed he recently rented it from one John Sloan. When Agent Gianatasio searched him Apuzzo produced a wallet containing a car registration listing him as a resident of Scarsdale, but to questions he answered that his address was in the Bronx. Cash in the amount of $1,366 was found on the defendant's person, and several thousand money wrappers and several hundred pads of paper were found in the rear room.

The agents and the defendant then proceeded into the front part of the store where the safe was and Apuzzo was asked to open the safe. According to the agents' testimony he denied knowledge of the combination until told it would be necessary to remove the safe from the premises and break it open, when he proceeded to open it. Within the safe were numerous compartments which were then broken open. Within them was found between $10,000 and $11,000 in cash, ownership of which Apuzzo immediately claimed, explaining that he kept it there to avoid having a lien placed on it as part of proceedings pending against him in the Tax Court. Also in the safe were two envelopes containing undated policy slips and some personal papers of defendant.

The agents then asked whether there were any other policy slips in the store.

At that juncture, according to the agents, defendant pointed to the scale near which stood codefendant Broussard; and the defendant said, "Ernie, give them the slips." Broussard then removed the weighing platform of the scale revealing about 150 recent policy slips, including the two bets the agents had placed that day. At the trial it was stipulated that defendant did not pay the special tax and did not register.

Apuzzo did not take the stand, but relied for his defense on the testimony of his brother-in-law, Isidori, and codefendant Broussard, both employees of his. On cross-examination it was shown that Broussard had lied about his own participation in the gambling operation when first arrested and had subsequently pleaded guilty and been convicted. It also came out that after his conviction his wife had asked the defendant to rehire him, and at the time of the trial Broussard was again in Apuzzo's employ. Isidori testified that he, Isidori, was home the afternoon the agents raided the store, and was surprised to receive a telephone call from defendant asking for the combination to the safe. He was surprised because Apuzzo knew the combination and opened the safe each day; Apuzzo sounded very agitated when he called. Broussard testified in regard to the scale incident that Apuzzo told him merely to give the agents the policy slips if he, Broussard, knew anything about them. The explanation advanced by counsel for defendant's evasive behavior when confronted by government men was that he first thought it was a holdup and then feared they were after him in connection with his pending tax matter. The defense was that Apuzzo never knew Broussard and Aaron were conducting a gambling operation in his store.

Defendant's first assignment of error is that there was insufficient evidence to support the finding of guilt, and this he has pressed vigorously on appeal. But this is completely without merit; actually the government presented a very strong case. It became common ground, as the trial progressed, that defendant's butcher shop was the scene of extensive policy operations. Hence the only possible defense was that Apuzzo, the proprietor, was quite oblivious to what was known and obvious in the neighborhood.[3] But this will not hold water. The evidence that the defendant's employees were openly receiving bets in his little store day after day; that winning numbers were posted on the front of the scale; that policy slips, as well as $10,000 in currency belonging to this apparently petty butcher shop, were found in the safe; that he lied about his identity when first accosted and lied about knowing the combination to the safe; and that he pointed to the scale where the recent policy slips were hidden when it appeared that the jig was up—all this makes the rather pitiful attempts of his employees to take the blame quite patently unsuccessful. In fact, even though it was contradictory and largely discredited, the testimony of the employees actually provided a certain amount of corroboration in details such as the defendant's knowledge of the combination to his safe. On the record the jury could hardly have brought in any other verdict. We turn, therefore, to the question of evidence at the heart of this case.

The incident here involved occurred on the second day of trial, after four government agents had testified and been cross-examined as to the facts already described. The government called the fifth agent, Gianatasio, who testified on direct as to incidents both in the back

3. The conclusion that he was knowing but tolerant will not suffice, since then he would be devoting the facilities of his shop to the furtherance of the venture and the advancement of the conspiracy. Further, an inference that he would allow his business to assume the reputation of a notorious gambling place out of good nature alone, and with no share of the gain, is hardly reasonable. See United States v. Masiello, 2 Cir., 235 F.2d 279, certiorari denied Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79.

room and in the main part of the store. The prosecutor, in examining Gianatasio as to the conversation in the back room, brought out the facts mentioned above, that Apuzzo gave a Bronx address despite his Scarsdale car registration and that Apuzzo at first denied being the owner of the store. The defense counsel extensively questioned Gianatasio on cross-examination until the following exchange occurred:

"Q. Did you then have a conversation with the defendant? A. Yes. I—

"Q. What did you say to him and what did he say to you? A. I asked him his name. He gave me his name. I asked him his address. He gave me a Bronx address. I asked him what his business was. He told me butcher. I asked him whether he was married. I asked him if he was ever arrested before.

"Mr. Roseman: At this time, your Honor—

"The Witness: You wanted to know what I asked him.

"Mr. Roseman: All right.

"The Court: At this time what?

"Mr. Roseman: I don't want the witness to just keep answering. I would rather ask the questions.

"The Court: You asked him what the conversation was. I didn't know that he had finished.

"Q. Did you tell Mr. Lemler—

"The Court: Had you finished telling about the conversation?

"The Witness: No, sir.

"Q. Did you tell Mr. Lemler—

"The Court: Just a minute. He didn't finish. A. When I asked him if he was arrested before, he told me he had been arrested for policy about 15 years ago. He didn't know the exact date.

"Mr. Roseman: At this time I object to the testimony and move for a mistrial.

"The Court: On what ground?

"Mr. Roseman: On the ground that this is prejudicial to the defendant."

The pertinent subsequent colloquy was as follows:

"Mr. Roseman: Yes, but that conversation is prejudicial.

"The Court: You brought it out.

"Mr. Roseman: He [the prosecutor] asked him what the conversation was and he didn't bring it out.

"The Court: Then why did you ask him to repeat it?

"Mr. Roseman: I wanted to see if he was telling the truth.

"* * *

"The Court: It was responsive. I don't see how you can control what the witness said in answer to the question.

"Mr. Roseman: I didn't open any door.

"The Court: You asked him what was said."

Further colloquy ensued both before and out of the presence of the jury, in which the prosecutor pointed out that his questions on direct had been limited to certain particular incidents and defendant's counsel had opened the question of a more general conversation in the back room. The court then reiterated several times its view that defendant had opened the issue and, the witness having sworn to tell the truth, "[h]ow could he possibly suppress part of the conversation?" But ultimately the court consented that counsel research the point over the holiday week-end. When the court reconvened on Monday the judge heard further argument, after which he decided to assume the blame for bringing out the testimony, but to direct the jury to disregard it. This he did in careful and precise instructions both then and

later in his formal charge.[4] But defendant urges that all this was insufficient to save the conviction.

The crux of defendant's contention is that the trial judge erred fatally when he did not keep from the jury the fact, whose truth is nowhere disputed, that fifteen years before this trial Salvatore Apuzzo was arrested for "policy." We are asked to rule that a new trial is mandatory because the jury, having learned this fact, may have inferred from it more than was warranted. And so, once the evidence had come out, there was nothing the judge could do to save the trial; an entirely new start was necessary and inevitable. The government claims, however, that the judge was entirely correct, since the defense brought out the evidence, and that in any event the admission could have done no harm in view of the judge's charge and the overwhelming proof of guilt. In Judge Medina's and my opinion the first ground is sound and entirely adequate without need of resort to the second ground.

Preliminarily to our discussion let us summarize the situation as it came before the judge. We have already noted that this particular cross-examination opened up an entirely new conversation. Further we should note these factors: (1) the witness' reply ending, "I asked him if he was ever arrested before" was a responsive and necessary answer to a direct question; (2) with this answer the damage, if any, was done and all the rest was but necessary clarification or repair in order not to leave the witness, the defendant, and the prosecution in an equivocal position where the worst might be suspected as to each; (3) the judge's ruling and the reply of the witness were made when the only objection before the court was that counsel did not "want the witness to just keep answering," and that he "would rather ask the questions"; (4) the judge was initially of the view that the defendant had opened the door and that the witness under oath could not suppress the testimony, but ultimately he decided—quite overgenerously—to assume entire responsibility, a course which obviously would relieve counsel of embarrassment to his client; and (5) the jury was charged, as precisely as is conceivable, to disregard the testimony.

It is now commonplace that the rules of evidence have tended ever more freely in the direction of admission of all relevant testimony in the light of modern experience that the truth is more often found by full revelation than by concealment. Hence we have the modern principle, stated in the Model Code of Evidence, and now embodied in Uniform Rules of Evidence, Rule 7: *"General Abolition of*

---

4. The court's statement to the jury was as follows:

"Good morning, ladies and gentlemen. I am sorry that we had to keep you waiting. All I can do is to assure you that we have not been idle while you have been in there, which probably even in this short period may have seemed to you a lot of time.

"However, at the close of the last session there was a witness on the stand who was asked a question by counsel for the defense and in answering the question said something about the previous arrest of this defendant.

"That ought not to have been brought out. Counsel in asking the question did not expect that it would be brought out, did not try to bring it out, and it was only on my insistence, and I wrongly insisted on it, that he told the whole story that was brought out.

"Now, the reason that the law does not permit testimony with respect to previous arrests is that an arrest means absolutely nothing, just as I told you at the beginning of the case, a man is presumed to be innocent until he is found guilty, and the arrest is nothing more than the information that I was talking to you about, so that it has no bearing on the question in the eyes of the law. And you are to disregard anything you heard. You can blame me for anything that occurred in that respect, because neither counsel is responsible for the fact that was brought out."

Finally, in his charge to the jury the next day, Tuesday, the judge further warned the jury as follows:

"Any testimony as to any previous arrest must be disregarded as having no probative value as to the guilt or innocence of the defendant."

\* \* \* *Exclusionary Rules.* Except as otherwise provided in these Rules, \* \* (f) all relevant evidence is admissible." And we have often admonished our trial judges to err, if at all, on the side of the admission, rather than the exclusion, of evidence. A trial judge must rule on admissibility quickly and almost by instinct; his instinct ought to be to bring out the truth, rather than to permit a party to cover up a part of his case. It is true that there are certain special privileges, such as that against self-crimination, which rest on a different background; but outside of these the search for the truth should be the lodestone.

Now in this search there are of course areas of irrelevancy where matter is kept from the jury because the danger of prejudice exceeds its probative force. Testimony about a defendant's prior misdeeds is usually excluded on this basis, although the trial judge may allow it in his discretion where it casts particular light on the defendant's identity or specific intent to commit the crime. See United States v. James, 2 Cir., 208 F.2d 124, 125; McCormick on Evidence 329 (1954); 2 Wigmore on Evidence §§ 300–304 (3d Ed. 1940). But the question of possible admissibility for such purposes [5] was of course never reached, since the prosecutor did not offer it, and the incident did not develop so far as to raise the issue. More pertinent here is the fundamental principle of evidence that a party by asking a broad question of the kind here involved may not object to the admission of the response he draws. See, e. g., United States v. Silver, 2 Cir., 235 F.2d 375, certiorari denied Silver v. United States, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80; Fidelity & Deposit Co. of Maryland v. Lindholm, 9 Cir., 66 F.2d 56, 89 A.L.R. 279; Pilot Life Ins. Co. v. Wise, 5 Cir., 61 F.2d 481; Pabst Brewing Co. v. E. Clemens Horst Co., 9 Cir., 264 F. 909; Riddle v. Gibson, 29 App. D.C. 237; Clum v. Guardian Life Ins.

Co., D.C.M.D.Pa., 24 F.Supp. 396, reversed on other grounds Guardian Life Ins. Co. of America v. Clum, 3 Cir., 106 F.2d 592, certiorari denied Clum v. Guardian Life Ins. Co., 309 U.S. 666, 60 S.Ct. 592, 84 L.Ed. 1013; Artcher v. McDuffie, 5 Barb., N.Y., 147; Levy v. Cascades Operating Corp., 176 Misc. 373, 27 N.Y.S.2d 258, reversed 263 App.Div. 882, 32 N.Y.S.2d 341, reversed 289 N.Y. 714, 46 N.E.2d 343; 1 Wigmore on Evidence § 18, note 34 (3d Ed. 1940); Rex v. King, 20 Cr.App.R. 158. This rule is grounded in the realities of trial experience; for generally speaking it is quite impossible for a litigant to compel a hostile witness to respond to questions and simultaneously keep the responses from the jury if and when they contain references to prejudicial incidents, such as prior arrests or convictions. Nor can the responsibility for the testimony be shifted from defense counsel to the trial judge. That counsel tried to withdraw his question after the damage was done did not help his case, nor was his objection at all clear. Indeed it then seemed—as he said in effect—that he was simply trying to introduce a new question without waiting for the witness to complete his answer to the former inquiry.

Moreover, in the circumstances presented here the trial judge would have been well within his discretion in requiring the witness to complete his answer even if proper objection were made. In an effort to show that Gianatasio's earlier testimony about incidents in the back room was fabricated or inaccurate, the defense asked him to relate the whole conversation which passed between himself and Apuzzo. Presumably the question was to show the jury that the witness could not recall the entire conversation or to suggest inconsistencies with the testimony of other agents, though actually they were not present at the conversation. But the witness was cut off before he finished his reply. If he considered the issue sufficiently germane,

---

5. E. g., to show prior knowledge of the criminality of the act were defendant

to rely on the contention noted in note 3 supra.

the trial judge could have allowed the government on redirect examination of the witness to complete the conversation to demonstrate that his story was neither fabricated nor based on hazy memory. Or had the prosecution, on redirect, asked for the full conversation—to avoid prejudice to the government from having suggested a black mark it could not support—it would have been proper, indeed almost necessary, that the judge admit the testimony. This is the familiar doctrine of "Verbal Completeness," see 7 Wigmore on Evidence §§ 2094, 2115 (3d Ed.1940), and is designed to prevent limitation of evidence to warp the truth and confuse the jury. Where the testimony necessary to complete the story is hearsay or other excludable matter the trial judge has discretion in deciding whether or not to permit completion. McCormick on Evidence 132 (1954). The same discretion must be allowed when completeness is sought not on redirect, but in the course of the cross-examination, as here.

Some suggestion for differentiation of this case is made that the defendant's counsel was taken by surprise and that the prosecution engineered the introduction of the testimony. Both grounds are ill founded and irrelevant. It is inconceivable that defense counsel experienced in criminal cases would have indulged in all the extended cross-examination of the government agents without appreciation of the risk involved. His hope of finding some inconsistencies in the evidence must have been tempered by knowledge of the risk of turning up something he would not like. But in any event the sound general principle that a litigant cannot object to, or secure a mistrial for, evidence he himself produces cannot be controlled by the degree of naïveté or sophistication of counsel. So far as the prosecution is concerned, there is nothing remotely to suggest impropriety on the part of the United States Attorney or indeed on the part of the witness unless answering responsively to a direct question can be so termed. But further, the implication that somehow the testimony should be geared to the defendant's objections is surely a dangerous one. It is hard to see how reversal here can be had without the implication that testimony should be manipulated, the last thing this court should even suggest.

The discussion had indicates that, while this prosecution may not be important in itself, the principles of procedure are most important. Particularly where the prosecution of crime is so important to the welfare of the community as in New York City must we take care lest we place in the hands of shrewd defense counsel an unjustifiable tactic for reversing fair convictions of guilty men. For if the defense can indulge in unlimited cross-examination and seek reversal on what is dredged up, then counsel will surely take advantage of this one-way street. In truth, if mistrials are thus easily secured then traps may be set forth for the judge whose very good nature is later labeled fatal error. Over-all it weakens the judge's control of his courtroom and his outstanding position in trial work. Of course, if through accident or through miscalculation of counsel the jury should learn facts about the defendant so inflammatory that they could not thereafter give him a fair trial, a new trial would be necessary; but neither the trial judge nor we think that the incident involved here even approached such a nature. Here the long record carefully examined shows outstanding skill, patience with the repetitive cross-examinations, and scrupulous care for the rights of the defendant on the part of a judge "distinguished for his courtesy, thoroughness and patience." Valensi v. Iravani, 2 Cir., 244 F.2d 261, 262. We have not hesitated to reverse district judges when their conduct of a specific trial seems to have resulted in unfairness; we shall stultify ourselves and the administration of criminal justice in this important district if we hold ourselves unable to recognize good trial conduct by a judge and take a case such as this out of his hands for automatic reversal.

In view of our firm conviction that Judge Dimock acted both fairly and wisely we have not thought it necessary to discuss the other point argued, namely, that in no event was there error here which persisted beyond the judge's charge and was actually prejudicial. United States v. Raspovich, 2 Cir., 241 F.2d 779; United States v. Cioffi, 2 Cir., 242 F.2d 473, certiorari denied Cioffi v. United States, 353 U.S. 975, 77 S.Ct. 1060, 1 L.Ed.2d 1137; United States v. Giallo, 2 Cir., 206 F.2d 207, 210, affirmed Giallo v. United States, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421.

Other claimed errors do not merit discussion.

Affirmed.

MEDINA, Circuit Judge, concurs in this opinion.

HINCKS, Circuit Judge (concurring).

Merely because defense counsel asked Gianatasio to relate his entire conversation with the defendant, the defense was not necessarily precluded, in my opinion, from withdrawing its request when the conversation had been only partially related. After Gianatasio in the course of his testimony said: "I asked him if he was ever arrested before," defense counsel interposed: "I don't want the witness to just keep answering. I would rather ask the questions" and then twice began a question about some other conversation. This made it abundantly plain that the defense was seeking to withdraw its blanket request for the whole conversation. And to have allowed him to proceed with his new line of inquiry would not have left the jury under the erroneous and confusing impression that the Gianatasio conversation with the defendant had been completed. For Gianatasio on a proper inquiry by the judge said bluntly that he had *not* "finished telling about the conversation."

In this situation, I think, the judge erred in insisting on a continuation of the narration of the conversation. I see nothing to suggest that in the situation presented the discontinuance of the narration at the instance of the defense would subject the prosecution to the hazard of an unfavorable inference or would in any way operate to warp the truth or confuse the jury. That being so, I doubt the applicability of the doctrine of "Verbal Completeness" to which the majority opinion refers. But even if at all applicable, the rule of completeness is subject to a very reasonable qualification: "where the remainder [of the conversation] is incompetent not merely as to form as in the case of secondary evidence or hearsay, but *because of its prejudicial character* then the trial judge should exclude if he finds that the danger of prejudice outweighs the explanatory value." McCormick on Evidence, page 132. In other words, when—as here—the continued narration of a conversation will bring in inadmissible matter possibly prejudicial and adds nothing to a solution of the issues, neither the judge nor the opposing counsel may properly cause it to come in. Gencarella v. Fyfe, 1 Cir., 171 F.2d 419; People v. Baker, 290 Ill. 349, 125 N.E. 263; People v. Schlessel, 196 N.Y. 476, 90 N.E. 44; Hathaway v. Tinkham, 148 Mass. 85, 19 N.E. 18; 20 Am.Jur., Evidence, Sec. 276; McCormick on Evidence, page 132, footnote 6; 31 C.J.S. Evidence § 190, p. 917 and footnote 82.[1]

Nevertheless, I would affirm the conviction on the ground that the error was not of sufficient substance to require a mistrial[2] or reversal. The most pertinent Supreme Court precedent is Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593. Here, as in Lutwak,

1. As to all other claims of error I am in full accord with the majority opinion.

2. I think the trial judge was in a better position than we to gauge the effect of the admission of the prior arrest. We should therefore give substantial weight to his evaluation of the problem. Webb v. United States, 10 Cir., 191 F.2d 512; United States v. Cioffi, 2 Cir., 242 F.2d 473; United States v. Giallo, 2 Cir., 206 F.2d 207, affirmed 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421.

the evidence of guilt is strong, as the majority opinion shows. Indeed the very strength of that evidence gives "fair assurance * * * that the judgment was not substantially swayed by the error." Thus reversal is not required under Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, and Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. In view of the massive weight of evidence pointing to guilt, it would be quixotic to attribute the verdict to the mere narration of an admission of an *arrest* for policy fifteen years earlier, especially in view of the judge's instruction, promptly made and later repeated in his charge, to disregard the admission of the prior arrest. United States v. Raspovich, 2 Cir., 241 F.2d 779; United States v. Chieppa, 2 Cir., 241 F.2d 635; United States v. Tramaglino, 2 Cir., 197 F.2d 928, 932, certiorari denied 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670; United States v. Nimerick, 2 Cir., 118 F.2d 464, 152 A.L.R. 620, certiorari denied 313 U.S. 592, 61 S.Ct. 1117, 85 L.Ed. 1546. Indeed, one may doubt that the express admission of the prior arrest, which came in and was the subject-matter of cautionary instructions, was as hurtful to the defense as would have been the admission which the jury would naturally have implied from the defense tactic in running away from the conversation which it had invited.

WATERMAN, Circuit Judge (concurring).

I concur with my colleagues in affirming the conviction below. I agree with Judge HINCKS for the reasons so ably stated by him—and with Judge Dimock—that witness Gianatasio's[1] statement that Apuzzo told him he had been arrested for policy about fifteen years before introduced error in the case.[2] I disagree with Chief Judge CLARK and Judge MEDINA who maintain this unfortunate statement was a proper one to be made under the circumstances of its making since it was elicited during cross-examination. I affirm because I am convinced from an examination of the stenographic minutes of the proceedings in their entirety that Judge Dimock's subsequent admonitions to the jury to disregard this testimony must have been heeded. I have enough confidence in jurors to believe that in the setting of this particular case—serious though the admission of this damaging inadmissible testimony most assuredly was—the sincerity of the trial judge in stating and restating his personal acceptance of the entire blame,[3] and his wish that for that reason the jury ignore the testimony, must have had its effect. Were I not so persuaded I would be forced to dissent—for I do not agree with Judge HINCKS that the evidence in the case points so overwhelmingly to the guilt of the defendant as to require affirmance on the ground that the error, had it not been cured, would have been harmless.

Judge FRANK was on the panel that heard argument in this case last term, and sat with us *en banc* when it was argued at this term. He was consistent throughout in holding that error was committed here, that this error was not harmless, and that it was not cured. He and I concurred in a proposed opinion

1. Gianatasio, one of the government witnesses, all of whom were employees of the U. S. Treasury, was an experienced investigator with the Alcohol & Tobacco Tax Division, and had been an employee of the Treasury for more than twenty years. Before this he had been a witness for the Government. For instance, he testified in a case cited in all three of our opinions here, United States v. Giallo, 2 Cir., 1953, 206 F.2d 207, at page 209 and footnote 2.

2. The error occurred because the trial judge, evidently completely unaware of what the witness would testify to, insisted that the witness continue to answer a question asked of him on cross-examination after he had been stopped by the cross-examiner, despite the cross-examiner's efforts to waive further reply and to ask a new question. In continuing his answer, the witness, so protected by the judge, brought out the damaging testimony.

3. See Chief Judge Clark's opinion, footnote 4.

written last term before the hearing *en banc* was decided upon that would have reversed the conviction and remanded for a new trial. At this term by memorandum vote after the hearing *en banc*, he reaffirmed his belief that the conviction should be reversed. It is, I think, of importance that his opinion be known, for it demonstrates that three of the five appellate judges who have considered this case concur with the district judge who tried it that the injection into the trial of this statement of a prior arrest was error.

It is fundamental that counsel usually assumes the risk of unfavorable responses to his own cross-examination. But here it seems clear that appellant's counsel was surprised when the fifth government agent he had cross-examined testified to a conversation not foreshadowed by any prior witness; and that when he discovered that the agent might testify to an admission by the defendant of a prior arrest, he did his best to cut off the indicated testimony and close the line of inquiry. The trial judge insisted that the witness complete the unfinished answer despite defense counsel's efforts to prevent reply. This case presents a situation unique on its facts. It seems clear that the testimony concerning the prior arrest came before the jury by accident rather than through any careless or designed "opening up" of a damaging conversation by defense counsel. Surely, therefore, as stated by Judge HINCKS, the continuing narrative should not have been testified to.

Apuzzo did not take the stand in his own defense. In fact, the error occurred during the Government's case and before the defense put in any evidence at all, except by way of cross-examination.

I turn now to the question of whether the error was so prejudicial as to require, unless cured by the court's instructions, an automatic reversal of the conviction. Rule 52(a) of the Federal Rules of Criminal Procedure, 18 U.S.C., as well as 28 U.S.C. § 2111, admonishes us to disregard any errors or defects which do not affect substantial rights. This command is couched in clear language, but its application presents most difficult problems. See United States v. Antonelli Fireworks Co., 2 Cir., 1946, 155 F.2d 631 (majority and dissenting opinions), certiorari denied, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640.

The Supreme Court has stated the test as follows:

"In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of *stare decisis* by what has been done in similar situations. * * * Necessarily the character of the proceeding, what is at stake upon its outcome and the relation of the error asserted to casting the balance for decision on the case as a whole, are material factors in judgment. * *

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. Bruno v. United States, supra 308 U.S. [287], at page 294, 60 S.Ct. [198] at page 200, [84 L.Ed. 257.] But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Kotteakos v. United States, 1946, 328 U.S. 750, 762, 764–765, 66 S.Ct. 1239, 1246, 90 L.Ed. 1557.

Subsequent to this Kotteakos decision we have held that references to prior arrests or convictions when the defendant does not take the stand and his character is not in issue, are prejudicial error. United States v. James, 2 Cir., 1953, 208

F.2d 124; United States v. Modern Reed & Rattan Co., 2 Cir., 1947, 159 F.2d 656, certiorari denied, 331 U.S. 831, 67 S.Ct. 1510, 91 L.Ed. 1845. These cases are authority for the proposition that such testimony is prejudicial error when it gets before the jury other than by deliberate or negligent conduct of defense counsel. This is so not because such testimony is irrelevant "but because of a dominant policy which recognizes that what tends to shows a likelihood that the accused has flouted the law at some other time is too apt to be given undue weight by the jury and to prejudice his right to a fair trial on the instant charge." United States v. James, supra, 208 F.2d at page 124. And see Michelson v. United States, 1948, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168. Obviously this is of particular importance when the prior arrest or conviction is for the same criminal activity.

With these guideposts at hand, I now turn to the overall situation at the trial, as I perceive it to have been.

To convict Apuzzo the Government had to convince the jury by circumstantial evidence and the proven overt acts of Aaron and Broussard that Apuzzo was in the "policy racket" with Aaron and Broussard during the period from July 28 through August 5, 1953. Though federal agents were in the butcher shop on five different occasions during those nine days and placed "policy" bets with Aaron and Broussard they never saw Apuzzo. Both Aaron and Broussard pleaded guilty prior to Apuzzo's trial. Broussard testified for the defense, and absolved Apuzzo of any connection with the "policy" operations. The Government presented a strong circumstantial case through the testimony of government employees tending to prove Apuzzo's complicity; and, although no direct evidence of day-to-day participation on the part of Apuzzo was

ever before the jury, there was indeed sufficient evidence to support a finding by the jury of guilt.

Apuzzo's employees testified stoutly, also. If they were believed, there was similarly sufficient evidence to support a verdict of acquittal. The defense could well maintain that there was insufficient credible proof of any "policy" participation by Apuzzo during the nine crucial days involved.

Although on the record before us it is highly probable that appellant may be guilty as charged, I do not find that this "record fairly shrieks the guilt," Lutwak v. United States, 1953, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, of Apuzzo during the time-period involved, nor do I believe that no reasonable jury could have acquitted. See, e. g., United States v. Chieppa, 2 Cir., 1957, 241 F.2d 635, 640; United States v. Tramaglino, 2 Cir., 1952, 197 F.2d 928, 932, certiorari denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670.

Therefore, it becomes a most delicate question for an appellate judge who believes that the evidence below of guilt is not completely overwhelming to appraise the effect that Gianatasio's statement may have had. For Gianatasio let the jury know that Apuzzo, himself, allegedly had said to the witness that he had been arrested for "policy" about fifteen years ago. Even though instructed that the statement should be ignored, this statement, erroneously before the jury, could well be the decisive bit to convince a doubting juror of the defendant's guilt.[4]

Recognizing this danger, I nevertheless hold here that in view of the unique circumstances in this case this error was cured and made harmless by the subsequent considered and sincere instructions of the distinguished, able and conscientious judge. The error would never have occurred but for the insistence of Judge

---

4. See, e. g., the oft-quoted concurring opinion of Mr. Justice Jackson in Krulewitch v. United States, 1949, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790: "The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers

know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54."

See also the remarks of the late Chief Judge Lehman of the New York Court of Appeals in People v. Robinson, 1937, 273 N.Y. 438, 445–446, 8 N.E.2d 25.

Dimock that Gianatasio complete his answer. This the jury well knew. The Judge accepted the entire blame for the occurrence and absolved defense counsel of any suspicion of deviousness. This also the jury well knew.

The erroneous introduction of an alleged statement by defendant that he had been previously arrested for a similar activity may be considered of such an exceptionally prejudicial character as to necessitate a new trial. See, e. g., United States v. James, supra. But the general rule is that where evidence is erroneously admitted the subsequent striking of it from the case, accompanied by a clear and positive instruction to the jury to disregard the evidence, cures the error. United States v. Giallo, 2 Cir., 1953, 206 F.2d 207, affirmed 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421; United States v. Curzio, 3 Cir., 1950, 179 F.2d 380; Marsh v. United States, 3 Cir., 1936, 82 F.2d 703; Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391; Samish v. United States, 9 Cir., 1955, 223 F.2d 358. I believe that the circumstances of this case warrant the application here of that general rule.