The **UNITED STATES** of America, for the **Use and Benefit** of Barnard W. **COFFEY**, Donald H. Teachout and H. R. Carpenter, d/b/a Coffey & Teachout, a co-partnership, Plaintiff,

v.

NATIONAL CONSTRUCTION COMPANY, a corporation, and Peerless Casualty Company, a corporation, Defendants,

and

Maryland Casualty Company, Impleaded Defendant.

Civ. No. 5968.

United States District Court
N. D. New York.
Oct. 11, 1957.

DeGraff, Foy, Conway & Holt-Harris, Albany, N. Y., for plaintiff. William F. Conway, Albany, N. Y., John G. Kissane, St. Albans, Vt., of counsel.

Morton M. Z. Lynn, Albany, N. Y., for defendants National Const. Co. and Peerless Cas. Co.

FOLEY, District Judge.

This action presents the usual tug-of-war that arises quite often between the prime contractor, subcontractor and bonding companies under certain provisions of the Miller Act, 40 U.S.C.A. § 270b. The trial before the Court contained all the extravagances, contradictions, confusion and bitterness that unfortunately arise in this type case and complicate what should be a clear-cut and straight forward presentation of facts to which the law should be applied. See U. S. for Use and Benefit of Soper v. Calvada, Inc., D.C.N.D.N.Y., 155 F.Supp. 744; United States for Use of Glickfeld v. Krendel, D.C.N.J., 136 F.Supp. 276. The only judicial approach that seems sane is to review the record and mass of exhibits in an attempt to fit the pieces in some semblance of order with the hope that the truth of the situation will shine forth. From this recanvass it seems to me that most of the right legally and factually rests with the plaintiff subcontractor.

First, a peaceful question of construction is involved as to the interpretation and application of the voluminous contract entered into by the defendant, National Construction Company, with the government (Plaintiff's Exhibit 1, 1A) and the subcontract between National and the plaintiff concern (Plaintiff's Exhibit 2), as they relate to the duty to provide temporary heat, as outlined in one of the Special Conditions of the prime contract entitled "SC-29 Temporary Heat". Exhibit 1, Vol. 1, page SC-17. This dispute is the principal and substantial one because the other detailed defenses, set-offs and counterclaim set forth in the amended answer of National and its surety, Peerless Casualty Company, as a defendant, strike me from the evi-

dence presented only as will o' the wisp endeavors.

The heart of the subcontract, although containing as usual many imposing printed clauses on a form devised by National Construction Company, is as simple as one can read. The plaintiff firm, engaged for many years in plumbing, heating, ventilating and sprinkler work, agreed in the important typewritten part of the agreement, among other things, "* * * to furnish labor and materials, tools, equipment to do all work as covered under Sections 21, 22, excluding all excavating, backfilling and painting. The intent of this contract is to include all work under the above stated sections of the specifications without exception and as indicated on plans, schedules, and general contract. * * *" The two enumerated sections, 21 and 22, of course, fit into the type of work done by the plaintiff firm and are entitled respectively "Plumbing and Gas Fitting" and "Heating and Ventilating". The defendant National wants to link, in some manner difficult for me to grasp, SC-29 relating to temporary heat with the above two specific sections and their detailed specifications (Exhibit 1, Vol. 2, pages 6–1 to 6–227), and impose the burden for temporary heat upon plaintiff, Coffey & Teachout.

■ There are many factors that militate against such strained construction, and most important are plain reading, obvious intendment and pure common sense. There is nothing I can find in Sections 21 and 22 and their detailed specifications, whether read horizontally or vertically, that attempts to weave into them the temporary heat special condition and obligation for such placed by precise statement upon the contractor. One of the arguments advanced by National seems to be that SC-29, inasmuch as it entails heat, should be treated as a specification under the plumbing and heating sections (1) because it is contained in the same volume of the general contract that contains Sections 21 and 22 agreed to by the plaintiff, and (2) the temporary heating clause could be performed only by the heating and steam-fitting contractor, and must be their responsibility. To state these contentions, in my judgment, is enough to reveal their absurdity.

There are also many practical factors disclosed by the evidence in regard to the disposition of the parties throughout the contract that, in my judgment, shatter the position assumed now by defendant National on the temporary heat proposition. The startling fact is that National paid plaintiff, Coffey & Teachout, although tardy on many payments, the sum of $102,913 on the agreed contract price of $136,716. It seems incredible that such payments would be made with little protest, if any, when there was honest feeling that the firm to whom such payments were being made might be held responsible for the substantial sum of $64,061.54 for fuel oil and labor for temporary heat. It would be a poor way to conduct the accounts of the corner grocery let alone a general construction firm. Another important fact is the agreement by National through its project superintendent (whom it now disowns) to accept the sum of $500 for fuel oil for testing (Exhibit 33) as prescribed in Section 22–20, page 22–15 (Exhibit 1, Vol. 1), clearly part of Section 22 agreed to by the use-plaintiff. All in all, in my judgment, there is no support, contractually or factually, to place the temporary heat provision upon the subcontractor. As stated recently: "That seems to us to be the common sense of the matter, and common sense often makes good law." Peak v. United States, 353 U.S. 43, 46, 77 S.Ct. 613, 615, 1 L.Ed.2d 631.

■ At this point, because it shall be important on the other issues involved, it may be well to discuss the approach I took during the trial to the exclusion or reception of the many exhibits in evidence. Sitting without a jury there was little fear of any prejudice, and I kept in mind throughout the liberal Federal Business Records Rule, 28 U.S.C.A. § 1732, particularly the part: "* * * All other circumstances of the making of such writing or record, including

lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect admissibility. * * *" Such approach, which is our usual custom in the federal courts, was vindicated again by Chief Judge Clark, Court of Appeals, Second Circuit, in United States v. Apuzzo, 245 F.2d 416, 421: "And we have often admonished our trial judges to err, if at all, on the side of the admission, rather than the exclusion, of evidence." I am also aware that letters, particularly unanswered ones, do not come within the category of business records and are objectionable. Amtorg Trading Corp. v. Higgins, 2 Cir., 150 F.2d 536, 539; Richardson on Evidence, 7th Edition, Section 419, page 349. However, I am willing to accept Judge Clark's advice and err on the side of admission. Therefore, although some have very shaky foundation and little probative value, I shall receive in evidence all the defendant National's exhibits upon which ruling was reserved. My position as to Exhibit G, objection to which was sustained at the trial, remains the same because it is a copy of a letter dated October 5, 1954, with no proof of mailing, receipt vigorously denied by plaintiff and signed by A. R. Rizzo, who did not appear or testify at the trial R. 265–267.

The next offset of money substance alleged by defendant National is its attempt to set off the sum of $12,081.-92 for electrical work, particularly as to the oil burners, it claims was done by the electrical subcontractor, Universal Electrical Company, that should have been done by the plaintiff firm. Again, it is impossible for me to read the terms of the contract in this respect as the defendant National would want it. The scope of the electrical work agreed to by Universal Electrical Company is very broad under the general provisions of Section 23, Part IV of the general contract. Exhibit 1, Vol. 1. Most significant, however, are the specifications as to this electrical work set forth in Part VI (Exhibit 1, Vol. 2, commencing at page 6–1). Here in detail the electrical work for each building is specified together with the plumbing and heating work, and throughout the electrical work specifications there is continuous reference as part of that work to oil burner reconnection, rehabilitation of oil burner control, wiring, installation of thermostats supplied by others, wiring from thermostat to oil burner in basement. (Exhibit 1, Vol. 2, pages 6–10, 6–19, 6–25, 6–26, 6–32, 6–38, 6–42, 6–43, 6–47, 6–48, 6–53, 6–54, 6–58, 6–59, 6–65, 6–66).

These details put to rest for me any idea that the plaintiff firm had much to do under the contract with the oil burner control wiring, its connection and rehabilitation. However, the gravest weakness as to these items is the complete failure on the part of the defendant National to offer any cogent proof that the work done by Universal according to its records covered something that should have been done by the plaintiff. Giannelli was a most unsatisfactory witness, a long distance operator at best, who knew little about what was actually done on the job in this respect. As to Exhibit AE, it is impossible to separate the wheat from the chaff in these records in an attempt to determine what Universal did other than what it was obligated to do under its own subcontract. The letter Exhibit AC-1 is an equivocal one and gives no aid to the solution of the problem. It is my conclusion that in this respect the defendant National must fail because of the lack of quality in its evidence.

With these two substantial items removed the charge that the plaintiff breached the contract falls by the wayside particularly in view of the over-all disposition I shall make in the matter. To me, the discrepancies in payroll hours are small and insignificant as are the variances in the work sheets, payroll records and force reports. Such mistakes are bound to be a part of the hurly-burly of the construction business, and to me it is commendable they were as accurate as they were. Coffey and Schweitzer impressed me as honest, fair-dealing men with quick admission and

reasonable explanation of their mistakes or lack of knowledge, and frank to admit when indebted, as for the fuel oil testing, installation of food equipment, truck rental, drinking fountain and "as is" drawings. R. 52, 58–61; 222–28, 371. As to the quality of the work done, the best endorsement was given by John Comeau, the Chief Inspector for the government at the Air Base of this project who, I am sure it is safe to say, was probably the most observant person at the site. R. 452.

■ The only challenge I can ascertain as to the change and extra work orders is that although they were in formal writings the requests and authorization were signed by John Coleman, the project superintendent for National on the project. Strangely enough, this same defense was used before me in the Calvada case, supra, and it did not impress me then nor does it now. Here we have a superintendent, clothed with all apparent authority by National, making out formal requests for work beneficial to the contractor and now being criticized by some unproven insinuation that he was not true to his employers. There was never any disavowal as to his action either oral or written during the period of construction. We would have to conclude that Rizzo, when he visited the job, played blind man's buff with his superintendent, and never looked over the project or the records at the site. More so, the accurate and competent records as to these orders duly show that under the system notice had to be brought home to National and that such orders were ratified by its conduct.

Under the testimony as I view it, the only awards I can make to National on its varied array of defenses, offsets and counterclaim are minimal ones mainly because there is insufficiency of proof or cloudy evidence upon which no intelligent decision could be made. Several of the set-offs allowed are not too firm in the evidence, but in an effort to do exact justice in this wilderness, some shall be granted mainly because of the concessions and admissions of the plain-

tiff at the trial. Under its set-off and counterclaim, there shall be allowed the total of $77.83 for the miscellaneous items set forth in Paragraph 11 of the amended answer, $500 for the fuel for testing if not already credited, $300 for the installation of food equipment, and $320 for the "as is" drawings. The total I compute as $1,197.83. The other items sought as off-set and counterclaim are disallowed and dismissed.

■ My decisions herein are made under the established principle that this statute must be liberally construed to effectuate its purpose. Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 380, 37 S.Ct. 614, 61 L.Ed. 1206; United States for Use of Baltimore Cooperage Co. v. McCay, D.C., 28 F.2d 777, 779; Indemnity Insurance Company of North America v. Browning-Ferris Machinery Co., 5 Cir., 227 F.2d 804, 807; Commercial Standard Insurance Co. v. United States for Use of Crane Co., 10 Cir., 213 F.2d 106, 107; United States ex rel. Purity Paint Products Corp. v. Aetna Casualty & Surety Co., D.C., 56 F.Supp. 431; Houston Fire & Casualty Insurance Co. v. United States for Use and Benefit of Trane Co., 5 Cir., 217 F.2d 727; Continental Casualty Co. v. Schaefer, 9 Cir., 173 F.2d 5, certiorari denied 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 1745.

My findings of fact are: That the plaintiff co-partnership duly and substantially performed all the terms and conditions of the contract entered into with defendant, National Construction Company, on July 23, 1954. That the terms of the general contract and the subcontract did not impose upon the plaintiff firm the obligation to provide fuel and maintain temporary heat as provided for in SC–29 of the general contract between National and the government. That the only obligation on plaintiff was to provide fuel oil for tests as provided in Section 22–20. That National made no mention of the failure of plaintiff to provide temporary heat until April 23, 1955. That the plaintiff performed all the necessary installations, controls and supplied equipment for the

oil burners as obligated, and there is no proper showing that the electrical work done by Universal Electrical Company in any way was the obligation of the plaintiff instead of that of Universal under Section 23 of the general contract. That the change and extra work orders were done by the plaintiff at the written request of John Coleman, project superintendent for National, who had apparent authority to issue the same, were brought to the attention of National and were never questioned. That the actual and apparent authority of Coleman, the sole representative of National in charge at the site of construction, was never disavowed by the defendant National orally or in writing, and in fact National, by its actions, ratified such authority. That the work done under these orders was performed satisfactorily and the charges under the same are fair and reasonable, and plaintiff is entitled to recover the full amount of these orders, $4,256.10. That as set-off and counterclaim the defendant National is only entitled to the sum of $1,197.83.

Conclusions of Law: The Court has jurisdiction of the subject matter and the parties; all the terms and conditions of the July 23, 1954 contract (Exhibit 2) were substantially performed by the plaintiff firm and there was no breach of performance on its part; the terms of this contract and that of the general contract (Exhibit 1, 1A) did not impose upon the plaintiff the obligation for temporary heat; there is failure of proof as to the claims of set-off and counterclaim as listed in paragraph 10 of the amended answer, except the amount of $1,197.83 is allowed as set-off to the claim of the plaintiff; that there is due and owing to the plaintiff the sum of $36,361.27 with interest from June 29, 1955, and it may have judgment accordingly against the defendants. The counterclaim against the plaintiff and the impleaded defendant, Maryland Casualty Company, is dismissed except as to the limited set-off granted in the amount of $1,197.83.

All motions made on behalf of the defendants are denied.

Because of the complexity of the matter and the fear of error in mathematics, a proposed judgment to the effect as herein outlined shall be submitted by the attorney for the plaintiff. Its form and content shall be agreed to by the attorney for the defendants, otherwise settled on three days' notice. See Matteson v. United States, 2 Cir., 240 F.2d 517.

The exhibits submitted in behalf of the parties will be held at my chambers for return to the respective attorneys at their convenience.